EL PUEBLO DE PUERTO RICO, peticionario, *v.* ROBERTO REXACH BENÍTEZ y ANA M. MILLÁN, recurridos.

*Números:* CE-91-447 *Resueltos:* 22 de abril de 1992
CE-91-513

274

278

*Francisco Valcárcel Mulero* y *Héctor Aníbal Castro*, abogados de la recurrida; *Jorge E. Pérez Díaz, Procurador General, Anabelle Rodríguez, Subprocuradora General,* y *Vanessa Ramírez, Procuradora General Auxiliar*, abogados del peticionario.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Nuestro análisis, razonamiento y decisión están enmarcados en varios postulados medulares de la democracia, a

saber: que nuestro sistema de gobierno es uno de ley y no de hombres; que la ley aplica a todos por igual; que nadie está por encima de ella, y que nuestro sistema judicial es de naturaleza adversativa.

En virtud de un *cuidadoso análisis* de las leyes aplicables y de los autos del caso resolvemos que: (1) El Fiscal Especial Independiente (en adelante F.E.I.) tiene jurisdicción para procesar únicamente por hechos ocurridos *con posterioridad* a la fecha de vigencia de la ley que lo creó, Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99–99z); (2) actos ocurridos con *anterioridad* a la vigencia de la ley que creó el F.E.I. sólo pueden ser procesados por los Fiscales del Departamento de Justicia, y (3) en consecuencia, revocamos la resolución del Tribunal Superior, Sala de San Juan (Hon. Elpidio Batista, Juez), que desestimó *todos* los cargos imputados a los recurridos por falta de jurisdicción y devolvemos el caso al tribunal de instancia para la continuación del proceso contra éstos en aquellos cargos en que se determinó causa probable para arresto, los cuales están fundamentados en hechos ocurridos con anterioridad a la vigencia de la ley que creó el F.E.I.

La *única controversia* planteada ante este Foro, tanto por el Procurador General como por el Hon. Senador Roberto Rexach Benítez y la Srta. Ana M. Millán, es una limitada *exclusivamente* a determinar quién *tiene jurisdicción* para procesar a los imputados, si el Secretario de Justicia de P.R. (en adelante el Secretario) o el F.E.I., y sobre qué actos. Por consiguiente, no podemos adjudicar (a iniciativa nuestra) si la acusación sometida contra el Hon. Senador Roberto Rexach Benítez constituye un procesamiento selectivo por razones políticas.

I

Delimitada así la encomienda, *no estamos pasando juicio sobre los méritos o deméritos de los cargos imputados, o*

*de las posibles defensas afirmativas que frente a éstos tengan los recurridos en la etapa en que se encuentran los procedimientos.*

Sería a destiempo cualquier expresión a iniciativa nuestra en cuanto a los señalamientos sobre alegado discrimen o persecusión política según sostiene la opinión disidente del compañero Juez Asociado Señor Rebollo López.

■ La fiscalización o procesamiento criminal selectivo es materia de una defensa afirmativa a alegarse y probarse por el imputado en el foro de instancia, que conlleva establecer un efecto discriminatorio en la aplicación de la ley a su caso y que el proceso en su contra fue motivado por esas razones. *Wayte v. United States*, 470 U.S. 598 (1985); Notas, *Executive Targeting of Congressmen as a Violation of the Arrest Clause*, 94 Yale L.J. 647 (1985); Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in Federal Criminal Proceedings*, 45 A.L.R. Fed. 732 (1979); Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings*, 95 A.L.R.3d 280 (1979).

El caso de autos *se encuentra en la etapa inicial preliminar* sin haberse levantado (mucho menos probado) un señalamiento específico sobre persecución política o procesamiento selectivo. Por ello no ha sido adjudicado por el foro de instancia *y no puede ser adjudicado por este Tribunal.* Este razonamiento y resultado fue el mismo utilizado por el compañero Juez Asociado Señor Rebollo López en su opinión disidente en el caso *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 170 (1984), al expresar lo que a continuación citamos literalmente:

Por último, y en vista de todo lo anteriormente expresado, somos del criterio de que en esta etapa de los procedimientos es total y completamente improcedente no sólo que este Tribunal se exprese sobre la corrección o incorrección de las determina-

ciones fiscales realizadas en el presente caso por el Departamento de Hacienda de Puerto Rico, sino que es igualmente improcedente que nos expresemos sobre si la "prueba ofrecida" por el demandante en apoyo de su alegación de persecución política es suficiente o no y cuáles deben ser las consecuencias de ello en la alternativa de que se concluyera que efectivamente hubo discrimen político. Es obvio que en estos momentos no estamos en la mejor posición para pasar juicio sobre ello. No debemos prejuzgar las cuestiones en controversia. Debemos recordar que nuestra función es eminentemente revisora y el presente caso no ha sido dilucidado en los méritos.

Por otra parte, la prominencia pública del acusado y el hecho de que sea miembro de una minoría, o la supuesta ausencia de acusación a otros supuestos violadores, *de por sí*, tampoco nos permite pasar juicio sobre la alegación de discrimen traída por la opinión disidente. *Cf. United States v. Diggs*, 613 F.2d 988 (Cir. D.C. 1979), *cert.* denegado, 446 U.S. 982 (1980); *Commonwealth v. Beneficial Finance Co.*, 275 N.E.2d 33 (1971); *State v. Gilbert*, 736 P.2d 857 (Idaho 1987); Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in Federal Criminal Proceedings*, supra, Secs. 6 y 7(d); Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings*, supra, Sec. 7.

En estas circunstancias, *sin prejuzgar sus méritos*, no es oportuno que pasemos juicio sobre tal defensa afirmativa, que no se ha presentado ante el foro de instancia[1] ni ante nos, y que archivemos los cargos criminales formulados en el presente caso como equivocadamente pretende dicha opinión disidente.

Tampoco podemos estar conformes con el razonamiento

---

[1] Los casos citados por la opinión disidente del compañero Juez Asociado Señor Rebollo López, *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145 (1984), y de *Pueblo v. Lausell Hernández*, 121 D.P.R. 823 (1988), *no* son de aplicación al caso ante nos. En ambos, la defensa afirmativa de procesamiento selectivo fue levantada y se trajo prueba para sustentarla en el proceso a nivel de instancia.

y curso decisorio de la opinión concurrente y disidente del compañero Juez Asociado Señor Negrón García.·

Lo ocurrido en el Senado de Puerto Rico no impedía que el Departamento de Justicia investigara y formulara los cargos que procedieran en derecho. De hecho, el propio Informe de la Comisión Especial creada en virtud de la R. del S. 16 de 23 de enero de 1989, así lo reconoce en la pág. 6 al expresar lo siguiente:

> Esta recomendación en forma alguna impide que el Departamento de Justicia obre, conforme a su criterio, como crea propio en la investigación de las imputaciones de que ha sido objeto el senador Rexach Benítez, de la misma forma en que lo ha hecho con respecto a otros senadores, con total independencia de lo que esta Comisión haya hecho o el Senado pueda hacer en este caso.

Precisamente en estos casos revisamos exclusivamente una decisión de un tribunal de instancia sobre una controversia de naturaleza jurisdiccional que surgió en ese proceso independiente de formulación de cargos por los fiscales del Departamento de Justicia. Veamos el trámite procesal y los eventos que generan los recursos de epígrafe.

## II

En enero de 1989 el Vicepresidente del Senado de Puerto Rico, Hon. Miguel A. Deynes Soto,([2]) presentó ante el entonces Secretario de Justicia (Hon. Héctor Rivera Cruz) una querella en contra del Senador Novoprogresista, Hon. Roberto Rexach Benítez (portavoz de la minoría en el Senado), alegando que éste tenía en la nómina de su oficina a una empleada (Ana Millán) que desde 1987 venía cobrando a nombre de otra persona (la monja Nélida M. Acosta Millán) por unos servicios que alegadamente no

---

([2]) Al momento de presentar la querella, el Senador Deynes Soto fungía como Presidente del Senado.

prestaba a la oficina de dicho Senador. La Srta. Ana Millán se desempeñaba como empleada del Municipio de San Juan desde 1987 hasta enero de 1989. *Dicha querella no fue juramentada.*

El Departamento de Justicia, por conducto de la Oficina de Investigaciones y Procesamiento Criminal (O.I.P.C.) realizó una investigación preliminar en torno a la referida querella. Concluida dicha investigación y sometido un informe para la aprobación o rechazo del Secretario, éste adoptó las recomendaciones del informe de la O.I.P.C. y, el 6 de julio de 1990, procedió a someter ante la consideración del Panel de ex jueces (el Panel), creado por la Ley sobre el Fiscal Especial Independiente, Ley Núm. 2, *supra*, su investigación preliminar relacionada con la querella.

█ En la carta del Secretario, en la que se refiere el asunto al Panel de ex jueces, se expresa en lo pertinente:

Luego de investigar los hechos antes mencionados, a base de la prueba testifical y documental recopilada durante el proceso, se ha determinado que existe causa suficiente para creer que el *Senador Rexach Benítez y su "empleada", señorita Ana Millán*, cometieron actos constitutivos de delito grave; algunos de los cuales fueron cometidos con posterioridad al 24 de marzo de 1988, fecha de vigencia de la Ley Núm. 2 de 23 de febrero de 1988, 3 L.P.R.A. sec. 99h et seq. (Supl. 1989), *que confiere al Fiscal Especial Independiente jurisdicción exclusiva para investigar y procesar las acciones penales que se le encomienden por el Panel respecto a toda información, informe o querella presentada sobre hechos ocurridos con posterioridad a la fecha de vigencia de la Ley.*

En el informe aludido se concluye que el Senado de Puerto Rico realizó a partir del mes de abril de 1988, veinte (20) pagos a favor de la Srta. Nélida M. Acosta Millán, los cuales recibió en realidad la Srta. Ana Millán, por efectuar ésta trabajos para beneficio personal del Senador Rexach Benítez. *Por razón de que dichos pagos fueron hechos en concepto de trabajos para beneficio particular del Senador Rexach Benítez y que éstos no fueron recibidos por la persona a nombre de quien se expidieron, existe causa suficiente para creer que tanto el Senador Rexach*

*Benítez como la Srta. Ana Millán incurrieron en veinte (20) vio-laciones al Artículo 166 del Código Penal* (Apropiación ilegal agravada), 33 L.P.R.A. sec. 4272 (Supl. 1989).

Igualmente, se concluye en el informe que debido a que la Srta. Ana Millán, quien a la sazón era empleada del Municipio de San Juan (desde el año 1987 hasta enero de 1989) y deven-gaba un sueldo quincenal por servicios supuestamente en bene-ficio del Municipio, recibió por espacio de ocho (8) meses la re-muneración correspondiente del Municipio en funciones que beneficiaban personalmente al Senador Rexach Benítez, ello configuró dieciséis (16) violaciones al Artículo 201 del Código Penal, 33 L.P.R.A. Sec. 4352, sobre aprovechamiento por fun-cionario de trabajos o servicios públicos.

En vista de lo anterior, *atendiendo al hecho de que los men-cionados delitos graves se cometieron con posterioridad a la vi-gencia de la Ley Núm. 2 de 1988, entiendo que su investigación y encauzamiento es de la jurisdicción exclusiva del Fiscal Espe-cial Independiente.* En consecuencia, *por este medio estoy refi-riendo dichos casos ante la consideración del Panel, con la re-comendación de que se designe un Fiscal Especial Independiente que proceda a investigar y a procesar dichos ca-sos,* de entender que existen fundamentos legales para ello, *en contra del Senador Roberto Rexach Benítez y la Srta. Ana Millán.*

. . . . . . . .

No puede olvidarse que el Departamento de Justicia tiene la responsabilidad legal de investigar todos aquellos asuntos que ameriten ser investigados y proceder, en el ámbito de su juris-dicción, como corresponda en derecho. En los casos de los fun-cionarios y los delitos especificados en la Ley Núm. 2, la respon-sabilidad de este Departamento culmina precisamente al referir dichos casos conjuntamente con la recomendación co-rrespondiente al organismo que, por consideraciones de política pública y por vía de excepción, el legislador le confirió injeren-cia exclusiva en su procesamiento.

. . . . . . . .

*Como les he indicado anteriormente, en el presente caso con-curren varios delitos graves cometidos antes y después de la vigencia de la Ley Núm. 2 de 1988. En ese sentido, le compete a este Departamento procesar los delitos de su jurisdicción, es de-cir, aquellos cometidos con anterioridad a la vigencia de la Ley Núm. 2 de 1988.*

No obstante, en vista de que le he solicitado al Panel que asuma jurisdicción sobre los delitos graves cometidos con pos-terioridad a la vigencia de la Ley Núm. 2, en deferencia a las

prerrogativas legales que le confiere la Ley Núm. 2 a su Oficina y por consideraciones de índole procesal, he estimado prudente esperar por la decisión que tenga a bien tomar el Panel respecto a la solicitud aquí formulada, *para proceder en forma coordinada con el encau[s]amiento de los casos.* El mecanismo de coordinación que por este medio sugiero entre el Fiscal Especial Independiente y el Departamento de Justicia podría ser de gran utilidad en casos como el presente, que por motivos jurisdiccionales se requiere la participación activa de ambos organismos, cada uno en el ámbito de su injerencia. De esta forma se evitaría el fraccionamiento de casos y más importante aún, la posibilidad de que surjan nuevamente situaciones como la ocurrida recientemente en el caso conocido como Career Index, cuando hubo que desestimar unos cargos por falta de jurisdicción. (Énfasis suplido.) Caso Núm. CE-91-447, Apéndices 46–49.

El 9 de julio de 1990, sometidas las querellas contra el Senador Rexach Benítez y la señorita Millán al Panel, el Senador Rexach Benítez solicitó a dicho Cuerpo que no asumiera jurisdicción sobre los casos porque:

1. *No se sometió una querella bajo juramento* como lo requiere la ley.

2. Transcurrieron más de noventa días (90) desde la fecha en que se inició la investigación hasta la fecha que se sometió el informe al Panel, todo ello en contravención a los términos dispuestos en la ley.

El 12 de julio de 1990 la señorita Millán hizo igual solicitud al Panel, suscribiendo *"los planteamientos jurisdiccionales* del Honorable Roberto Rexach Benítez en este asunto". (Énfasis suplido.) Caso Núm. CE-91-447, Apéndice 29.

Mediante carta de 3 de agosto de 1990, el Panel le solicitó al Secretario su reacción a los planteamientos del Senador Rexach Benítez. Replicados por el Secretario dichos planteamientos, el Panel emitió una Resolución el 20 de septiembre de 1990 donde dispuso:

El examen del expediente completo del procedimiento seguido en *este caso* confirma la validez del planteamiento del

Senador Roberto Rexach Benítez de que la investigación preliminar que le sirvió de base al Secretario de Justicia para recomendarle a este Panel la designación de un Fiscal Especial Independiente, no partió *de la información bajo juramento* que requiere el Artículo 4 de la Ley 2 de 23 de febrero de 1988. En vista de ello, el Panel concluye que está impedido de continuar con cualquier trámite ulterior *en este caso*, por lo que *procede a devolver el mismo al Secretario de Justicia para el trámite que él estime pertinente.*([3]) (Énfasis suplido.) Caso Núm. CE-91-447, Apéndice 15.

El 18 de abril de 1991, devuelto el caso al Departamento de Justicia, el Ministerio Público (Fiscal ordinario) sometió ciento veinte (120) cargos criminales contra el Senador Rexach Benítez y la señorita Millán, que se desglosan como sigue:

1. Contra el Senador Rexach Benítez:

a. Treinta (30) cargos por alegada violación al Art. 166(a) del Código Penal, 33 L.P.R.A. sec. 4272(a) (apropiación ilegal agravada). De éstos, nueve (9) cargos se refieren a hechos ocurridos con anterioridad al 25 de marzo de 1988, fecha en que entró en vigor la Ley sobre el Fiscal Especial Independiente, Ley Núm. 2, *supra*, y veintiuno (21) son de fecha posterior.

b. Treinta (30) cargos por alegada violación al Art. 272 del Código Penal, 33 L.P.R.A. sec. 4592 (posesión y traspaso de documentos falsificados). De éstos, nueve (9) se fundamentan en hechos ocurridos con anterioridad a la vigencia de la Ley Núm. 2, *supra*, y veintiuno (21) a hechos posteriores.

2. Contra la Srta. Ana Millán:

a. Treinta (30) cargos por alegada apropiación ilegal agravada. Art. 166(a), *supra*. De éstos, nueve (9) cargos se

---

([3]) Adviértase que la resolución no hace referencia a la señorita Millán. Sin embargo, se refiere al *caso* sometido por el Secretario de Justicia. Más adelante analizaremos el efecto de dicha resolución del Panel sobre el caso de la señorita Millán.

refieren a hechos ocurridos con anterioridad a la vigencia de la Ley Núm. 2, *supra,* y veintiuno (21) a hechos posteriores.

b. Treinta (30) cargos por alegada posesión y traspaso de documentos falsificados. Art. 272 del Código Penal, *supra.* De éstos, nueve (9) se fundamentan en hechos ocurridos con anterioridad a la vigencia de la Ley Núm. 2, *supra,* y veintiuno (21) a hechos posteriores.

Sometidos los cargos para determinación de causa probable para arresto (Regla 6 de Procedimiento Criminal, 34 L.P.R.A. Ap. II), el Hon. Juez de Distrito, Carlos V. Dávila, hijo (Hon. Juez Dávila) desestimó los cuarenta y dos (42) cargos fundamentados en hechos posteriores a la fecha de vigencia de la Ley Núm. 2, *supra* (veintiuno (21) por el Art. 166(a) y veintiuno (21) por el Art. 272, ambos del Código Penal, *supra*) en contra del Senador Rexach Benítez. Al así actuar acogió el planteamiento del Senador Rexach Benítez de que el encausamiento por delitos *cometidos con posterioridad* al 25 de marzo de 1988 (fecha de vigencia de la Ley Núm. 2, *supra*) competen a la jurisdicción exclusiva del F.E.I.

Ahora bien, con relación a los dieciocho (18) cargos fundamentados en hechos anteriores a la vigencia de la Ley Núm. 2, *supra,* asumió jurisdicción y determinó causa probable en seis (6) de los nueve (9) cargos por apropiación ilegal agravada, Art. 166(a) del Código Penal, *supra,* y no causa en los otros tres (3). Determinó no causa en los nueve (9) cargos por alegada posesión y traspaso de documentos falsificados. Art. 272 del Código Penal, *supra.*

En cuanto a la señorita Millán, el Hon. Juez Dávila *no* acogió el planteamiento de falta de jurisdicción hecho por ésta[4] y asumió jurisdicción sobre *todos* los cargos. Desfilada la prueba, determinó causa en veinte (20) de los

---

[4] En ese momento la defensa de la señorita Millán no recurrió al Tribunal Superior en revisión.

treinta (30) cargos contra ésta por alegada apropiación ilegal agravada, Art. 166(a) del Código Penal, *supra*.([5]) Determinó no causa en el resto de los cargos (diez (10) por el Art. 166(a) y treinta (30) por el Art. 272, ambos del Código Penal, *supra*).

De la determinación del Hon. Juez Dávila que desestima por falta de jurisdicción los cuarenta y dos (42) cargos contra el Senador Rexach Benítez fundamentados en hechos posteriores a la fecha de vigencia de la Ley Núm. 2, *supra*, recurrió El Pueblo en revisión ante el Tribunal Superior (Hon. Silvia Ricard, Juez). La Juez Ricard confirmó la determinación hecha por el Hon. Juez Dávila. Al así actuar, la Honorable Juez Ricard expresó:

> Una serena lectura de dicha resolución emitida por el Panel, nos da a entender que el Panel nunca procedió a nombrar un Fiscal Especial Independiente y lo que pasó en realidad fue que determinó que estaba impedido por ley de asumir jurisdicción sobre el asunto, *hasta tanto el Secretario de Justicia no procediera a presentar de nuevo el caso ante el Panel, cumpliendo con el requisito establecido en la ley, supra, de que la información tiene que estar debidamente juramentada antes de presentarse para la investigación preliminar por el Secretario de Justicia.*
>
> *El Secretario de Justicia no puede pretender evadir el procedimiento establecido por una ley especial, matizada de un alto interés público, presentando motu propio [sic] las denuncias en contra del imputado de epígrafe, directamente ante este tribunal, lo cual es una actuación completamente ilegal.*
>
> Este tribunal no puede asumir jurisdicción sobre la persona del imputado, hasta tanto no se cumpla cabalmente con el procedimiento establecido en la ley creadora del Fiscal Especial Independiente, supra.
>
> El Secretario de Justicia tiene la obligación legal de volver a presentar su informe preliminar, conforme a los requisitos que la propia ley, supra, establece, para que pueda el Panel proceder a hacer su determinación en los méritos de si procede o no nombrar, a base del Informe del Secretario de Justicia, un Fiscal Especial Independiente, que será o no quien presente los

---

([5]) No surge de los autos cuántos de estos veinte (20) cargos están fundamentados en hechos anteriores a la fecha de vigencia de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z) y cuántos en hechos posteriores.

posibles cargos criminales en contra del Senador Rexach Bení-
tez a su debido tiempo. (Énfasis suplido.)

Simultáneamente, El Pueblo recurrió en vista en alzada
ante el Tribunal Superior (Hon. Elpidio Batista, Juez) para
revisar la determinación de no causa (Regla 6 de Procedi-
miento Criminal, *supra*) del Juez Dávila contra el Senador
Rexach Benítez en los tres (3) cargos por alegada apropia-
ción ilegal agravada (Art. 166(a) del Código Penal, *supra*) y
en los nueve (9) cargos por alegada posesión y traspaso de
documentos falsificados (Art. 272 del Código Penal, *supra*),
cuyos hechos ocurrieron con anterioridad a la vigencia de
la Ley Núm. 2, *supra*, así como en los diez (10) cargos por
alegada violación al Art. 166(a), *supra*, y treinta (30) car-
gos por violación al Art. 272, *supra*, contra la Srta. Ana
Millán. La defensa de los imputados le planteó al Honora-
ble Juez Batista que la Ley Núm. 2, *supra*, privaba de ju-
risdicción al Secretario para encausarlos tanto por delitos
cometidos antes como después de la vigencia de dicha ley.

El Honorable Juez Batista acogió los planteamientos de
la defensa y ordenó la desestimación de *todos* los cargos
por entender que carecía de jurisdicción sobre ambos
imputados.([6])

Esa orden del Honorable Juez Batista se produjo
cuando ya habían comenzado los procedimientos de vista
preliminar en el Tribunal de Distrito (Hon. Awilda Irizarry
Pardo, Juez) en aquellos cargos en que el Honorable Juez
Dávila había determinado causa probable para arrestar.
Comenzada la vista preliminar, la defensa de ambos impu-
tados solicitó la desestimación de las denuncias en los car-
gos objeto de la vista preliminar. Ante la Honorable Juez
Irizarry planteraron igual argumento de falta de

---

([6]) El Honorable Juez Batista ordenó la desestimación de cargos *que no estaban*
ante su consideración puesto que la vista en alzada sólo se refería a los cargos sobre
los cuales el Honorable Juez Dávila no encontró causa probable para arresto contra
ambos imputados.

jurisdicción. La Honorable Juez Irizarry denegó la moción de desestimación. Al así decidir, resolvió que la Ley Núm. 2, *supra*, no priva al Secretario de la facultad para presentar los cargos imputándole *la comisión de delitos en fechas anteriores a la fecha de vigencia de dicha ley*, tanto al Senador Rexach Benítez como a la Srta. Ana Millán.

Resolvió, además, que toda vez que la señorita Millán nunca compareció al Panel a impugnar la recomendación del Secretario para que se le presentaran cargos por la vía ordinaria, ni surge de la resolución del Panel determinación alguna al efecto de que en su caso exista un conflicto de intereses que impida al Secretario realizar una investigación objetiva en su caso, no había impedimento alguno para procesarla por la vía ordinaria en todos los cargos. Concluyó, en consecuencia, que procedía la celebración de la vista preliminar en los casos en que el Honorable Juez Dávila había determinado causa probable para arresto contra ambos imputados.

De esta determinación acudieron los imputados vía *certiorari* al Tribunal Superior (Hon. Elpidio Batista, Juez). En auxilio de jurisdicción, solicitaron la paralización de los procedimientos de vista preliminar.

En revisión, el Honorable Juez Batista ordenó la paralización de los procedimientos y, luego, mediante extensa resolución escrita, revocó la decisión de la Honorable Juez Irizarry y ordenó la desestimación de *todos* los cargos contra los imputados.([7])

Inconforme, acude ante nos El Pueblo representado por el Hon. Procurador General (Caso Núm. CE-91-447) y nos solicita la revisión de las determinaciones de la Honorable Juez Ricard y del Honorable Juez Batista. Al respecto nos señala:

---

([7]) Esta determinación del Honorable Juez Batista lo que hace es confirmar, cuando sí tenía ante sí los cargos por los que se determinó causa probable para arresto, su determinación anterior de vista en alzada bajo el palio de la Regla 6 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

A. PRIMER ERROR:

Incidieron ambos Magistrados al resolver que la ley que crea el cargo de Fiscal Especial Independiente priva de jurisdicción al Secretario de Justicia para encausar a los funcionarios-recurridos, aun después que el Panel decidió no considerar la información de conducta delictiva que contiene el informe de investigación preliminar del Secretario, por el fundamento que el Secretario no recibió bajo juramento la información que sirvió de base a su informe.

B. SEGUNDO ERROR:

En la alternativa, incidió el Magistrado que presidió la vista en alzada de causa para arresto, al concluir que la Ley Núm. 2 priva de jurisdicción al Secretario de Justicia:
 (1) Para encausar tanto a Rexach Benítez como a Millán Álvarez por la comisión de delitos en fechas *anteriores* a la fecha de vigencia de la ley, y
 (2) para encausar a Millán Álvarez por la Comisión de delitos en fechas *posteriores* a la fecha de vigencia de la ley. Caso Núm. CE-91-447, Petición de *certiorari*, pág. 9.

Con posterioridad a que el Honorable Juez Batista redujera a escrito su decisión, acudió ante nos el Procurador General (Caso Núm. CE-91-513) señalando que:

Erró el honorable tribunal de instancia al resolver que el Art. 22 de la Ley Núm. 2 priva de jurisdicción al Secretario de Justicia para encausar a los funcionarios-recurridos, aun después que el Panel rehusó considerar el informe de conducta delictiva que le sometió el Secretario, por el fundamento que el Secretario no recibió bajo juramento la información que sirvió de base a su informe. Caso Núm. CE-91-513, Petición de *certiorari*, pág. 10.

Los recurridos presentaron oportuna oposición a ambos recursos.

El 30 de agosto de 1991 emitimos una orden para que los recurridos mostraran causa por la cual no debíamos revocar las resoluciones recurridas en el Recurso Núm. CE-91-447. En particular, le ordenamos a los recurridos expresarse sobre:

1) ¿Por qué deben desestimarse los cargos radicados contra el Senador Roberto Rexach Benítez y la Sr[t]a. Ana Millán, cuando éstos están basados en hechos ocurridos antes del 24 de marzo de 1988, siendo postulado legal que la ley aplicable a un caso es aquella vigente al momento en que ocurren los hechos, y disponiendo expresamente el Art. 22 de la Ley Núm. 2 del 23 de febrero de 1988 su carácter prospectivo?; 2) la recurrida Ana Millán deberá ilustrar a este foro sobre la aplicabilidad de la Ley Núm. 2 a su persona y el efecto, si alguno, de su omisión de acudir al panel para impugnar la determinación del Departamento de Justicia de acusarla a través del trámite ordinario, particularmente cuando la resolución de dicho panel del 20 de septiembre de 1990 guardó silencio sobre su caso. Las partes deberán además expresarse sobre cual[es]quiera otros extremos pertinentes para la fiel solución de este recurso. Caso Núm. CE-91-447, Resolución de 30 de agosto de 1991, págs. 1–2.

Mediante Resolución de 27 de septiembre de 1991 emitimos, en el Recurso Núm. CE-91-513, una orden para que los recurridos mostraran causa por la cual no debíamos revocar la resolución (escrita) del Honorable Juez Batista. Además, consolidamos ambos recursos.

Los recurridos han comparecido. Resolvemos.

## II

 Originalmente, la figura del F.E.I. se instaura en Puerto Rico mediante la Ley Núm. 1 de 18 de enero de 1985 (3 L.P.R.A. sec. 90 n.) para la investigación y posterior procesamiento, por las violaciones a la ley penal que fueran procedentes, surgidas como consecuencia de los sucesos ocurridos el 25 de julio de 1978 en el Cerro Maravilla de Villalba. *Cf. Pueblo v. González Malavé*, 116 D.P.R. 578 (1985); *Pueblo v. Pérez Casillas*, 117 D.P.R. 380, 398 (1986). La Ley Núm. 1, *supra*, contrario a la Ley Núm. 2, *supra*, que nos ocupa, extendía expresamente su alcance y efecto retroactivamente a los sucesos del 25 de julio de 1978, así como a sus antecedentes y a los acontecimientos posteriores a esa fecha. Véanse: Art. 2 de la Ley Núm. 1, *supra*,

1985 Leyes de Puerto Rico 11; *Pueblo v. Pérez Casillas*, 126 D.P.R. 702 (1990); *In re Colton Fontán*, 128 D.P.R. 1 (1991).

En *Pueblo v. Pérez Casillas,* supra, delimitamos el alcance de la jurisdicción del F.E.I. creado por la Ley Núm. 1, *supra.* Señalamos que:

> ... [H]emos resuelto que la autorización que se concede a funcionarios públicos para casos específicos, y no en forma general, debe ser interpretada de manera restrictiva. Véanse: *White Star Bus Line, Inc. v. Sánchez*, 59 D.P.R. 748, 752 (1942); Bernier y Cuevas Segarra, *op. cit.*, pág. 472.
>
> Igual tratamiento, e interpretación restrictiva se impone en el presente caso. Como es sabido, *en nuestra jurisdicción la facultad y responsabilidad de investigar, acusar, y procesar alegada conducta constitutiva de delito público recae, de ordinario y como regla general, en la persona del Secretario del Departamento de Justicia de Puerto Rico y de los fiscales que están adscritos al referido Departamento.* Véase 3 L.P.R.A. secs. 72, 90, 91 y 95.
>
> Ello no obstante, la Asamblea Legislativa de Puerto Rico en años recientes ha entendido procedente crear el cargo de "Fiscal Especial Independiente" con el propósito de que éste actúe como tal —y en sustitución, o en lugar, del Secretario y los fiscales del Departamento de Justicia— *en relación con ciertas, específicas y determinadas situaciones de hechos.* Tal es el caso del F.E.I. designado específicamente para investigar los "Sucesos del Cerro Maravilla", creado el cargo mediante la citada Ley Núm. 1 y *el de los "Fiscales Especiales Independientes", la designación de los cuales contempla y autoriza la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z) "bajo la supervisión de un Panel nombrado por el Gobernador del Estado Libre Asociado de Puerto Rico y compuesto exclusivamente por ex Jueces del Tribunal Supremo o Superior, o de ambos", el cual mecanismo "garantiza la absoluta objetividad de investigaciones contra altos funcionarios del Gobierno".* (Énfasis en el original suprimido, énfasis suplido y escolio omitido.) *Pueblo v. Pérez Casillas*, supra, págs. 709–710.

Finalmente allí reconocimos que:

> No podemos perder de perspectiva que toda concesión de jurisdicción, por más amplia y el abarcadora que resulte, necesariamente conlleva unos límites. En el caso de los Fiscales Especia-

les —a quienes por su naturaleza excepcional se les concede una encomienda específica— resulta de particular importancia que deslindemos cuidadosamente el alcance de la jurisdicción de éstos, tomando en consideración, repetimos, que *como regla general la jurisdicción para investigar y procesar los delitos que se cometen en Puerto Rico corresponde al Departamento de Justicia y que, sólo en circunstancias excepcionales, se justifica la intervención de un fiscal especial*; no teniendo dichos funcionarios la facultad para determinar el alcance de su propia jurisdicción. (Énfasis en el original suprimido y énfasis suplido.) *Pueblo v. Pérez Casillas*, supra, pág. 712.

Las expresiones de este caso en cuanto a la naturaleza y el alcance de la jurisdicción limitada correspondiente al F.E.I. *vis-à-vis* la jurisdicción general de los fiscales ordinarios son igualmente aplicables a los hechos de autos. La variante está en las disposiciones expresas de las leyes que crean uno y otro cargo, a saber: la Ley Núm. 1, *supra*, y la Ley Núm. 2, *supra*.

## III

▉▉▉ Con el propósito expreso de "prevenir, erradicar y penalizar cualquier comportamiento delictuoso o indebido por cualquier funcionario gubernamental" y así "restaurar la confianza del pueblo en su gobierno y en sus servidores públicos", se aprobó la Ley Núm. 2, *supra*. Véase su Exposición de Motivos, 1988 Leyes de Puerto Rico 6. Ello, ya que la política pública del Gobierno del Estado Libre Asociado de Puerto Rico va dirigida a fomentar la dedicación de sus funcionarios y empleados a la gestión y al servicio público honesto y excelente, tanto profesional como personalmente, donde el derrotero a seguir sea la dedicación absoluta al bienestar y el desarrollo integral de nuestro pueblo. Véase Art. 1 de la Ley Núm. 2, *supra*, 3 L.P.R.A. sec. 99h. Nuestro pueblo, quien sostiene económicamente esa gestión pública, no merece menos. *Cf. Torres Solano v. P.R.T.C.*, 127 D.P.R. 499 (1990).

■ Para mantener y garantizar la más absoluta objetividad en las investigaciones por alegado comportamiento delictivo o indebido de los altos funcionarios, empleados del Gobierno y otras personas, la ley adoptó el mecanismo del F.E.I., bajo la supervisión de un Panel de ex jueces nombrado por el Gobernador, para llevar a cabo la investigación y, si es necesario, el procesamiento de la conducta de las personas reguladas por dicha ley. Véase Leyes de Puerto Rico, *supra.*

Esa objetividad resulta necesaria ante la posibilidad de que se utilice el procedimiento ordinario para perseguir adversarios políticos, suprimir a los disidentes u oprimir a las minorías. También puede utilizarse para encubrir actuaciones delictivas o indebidas de los miembros de la administración en el poder. Si algo nos enseña la experiencia de los sucesos del Cerro Maravilla es que estas posibilidades no son ajenas a nuestra realidad sociopolítica y que, aun en nuestro sistema democrático, tales excesos de poder pueden tomar realidad material. *Cf. In re Coltón Fontán,* supra; *Noriega v. Gobernador,* 122 D.P.R. 650 (1988); Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico, *Informe sobre discrimen y persecución por razones políticas: la práctica gubernamental de mantener listas, ficheros y expedientes de ciudadanos por razón de su ideología política,* 51 Rev. C. Abo. P.R. 1 (1990).

■ En síntesis, al igual que la Ley Núm. 1, *supra,* la Ley Núm. 2, *supra,* "respondió a la necesidad de realizar una investigación completa e imparcial" donde se eliminara "todo conflicto de intereses entre los investigadores e investigados". *In re Colton Fontán,* supra, pág. 105. En lugar de utilizar el trámite tradicional y ordinario, la Ley Núm. 2, *supra,* dispuso que fuera un Fiscal Especial Independiente, con criterio objetivo e imparcial y nombrado por un Panel de ex jueces desinteresados, el que investigara y encausara a los empleados, funcionarios y otras personas

cubiertas por la ley que incurren en conducta delictiva o indebida.

 Claro está, *a contrario sensu*, cuando la conducta de los empleados, funcionarios u otras personas o la temporalidad de los hechos no están "específicamente señalada[s] o comprendida[s] dentro del marco de la jurisdicción investigativa concedida al F.E.I., le corresponde a los fiscales 'regulares' la investigación y procesamiento de la referida conducta delictiva" —(énfasis suprimido) *Pueblo v. Pérez Casillas*, supra, págs. 711–712— ya que, como regla general, a éstos corresponde la facultad y responsabilidad constitucional de investigar, acusar y procesar a los individuos que incurren en alegada conducta tipificada como delito público en nuestro país. Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1; 3 L.P.R.A. secs. 72, 90, 91 y 95; *Pueblo v. González Malavé*, supra, pág. 584; D. Nevares-Muñiz, *Sumario de derecho procesal penal puertorriqueño*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1980, pág. 25.

IV

 Ahora bien, las disposiciones de la Ley Núm. 2, *supra*, se activan con una querella *juramentada* presentada ante el Secretario.[8] Al respecto, el Art. 4 de la Ley Núm. 2, *supra*, 3 L.P.R.A. sec. 99k, dispone:

(1) El Secretario de Justicia llevará a cabo una investigación preliminar en todo caso en que reciba *información bajo juramento* que a su juicio constituya causa suficiente para investigar si se ha cometido cualquier delito grave y menos grave incluido en la misma transacción o evento y los delitos contra los derechos civiles, la función pública y el erario público .... (Énfasis suplido.)

---

[8] Salvo en los casos en que la conducta delictiva o indebida, prohibida en la ley, se le imputa al Secretario de Justicia, en cuyo caso se presenta la querella directamente al Panel. En tal caso, si se presenta en el Departamento de Justicia, este departamento debe remitirla directamente al Panel. 3 L.P.R.A. sec. 99m.

En nuestro ordenamiento procesal penal ordinario la denuncia que imputa la comisión de un delito debe ser jurada por el denunciante. Reglas 5 y 35 de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[9] El defecto de no jurar la denuncia es fundamento suficiente para desestimar la denuncia (Regla 64(c) de Procedimiento Criminal, 34 L.P.R.A. Ap. II) pero sin perjuicio de que dicho defecto sea subsanado (Regla 67 de Procedimiento Criminal, 34 L.P.R.A. Ap. II) antes de que el delito haya prescrito. Regla 66 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Tal omisión es subsanable si se subsana antes de que prescriba el delito. Nevares-Muñiz, *op. cit.*, pág. 84.

El requisito de juramentación expone al querellante a la penalidad por perjurio, de ser falsa la información brindada, y disuade así la presentación de querellas frívolas y hostigantes.[10] *Cf.* Regla 13(c) del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. I-A. Cuando dicho requisito se exige en la ley o en el reglamento, *su cumplimiento debe ser estricto*, porque éste resulta en una salvaguarda procesal valiosa para el querellado cuya reputación se pone en tela de juicio ante la comunidad.

Lo anterior nos permite concluir que el requisito legal de juramentación de la información o querella dispuesto en el Art. 4 de la Ley Núm. 2, *supra*, no es jurisdiccional sino de cumplimiento estricto. Su incumplimiento no priva al Secretario de su deber legal de iniciar una in-

---

[9] En las Reglas de Procedimiento Civil, el requisito de juramentar las alegaciones, mociones y otros escritos judiciales es la excepción y no la regla. A menos que las reglas o la ley disponga de otro modo, no es necesario jurar las alegaciones. El propósito del juramento es el someter a la parte a la penalidad de perjurio si se probare que el contenido de sus manifestaciones o declaraciones bajo juramento son falsas. *Piñero v. Martínez Santiago*, 104 D.P.R. 587, 589–590 (1976).

[10] La imposición de los "costos incurridos en los procedimientos" impuesta por el Panel, cuando determine que la información es frívola, es otro de los disuasivos dispuestos en la Ley sobre el Fiscal Especial Independiente, 3 L.P.R.A. sec. 99k(6).

vestigación preliminar, *pero impide al Panel pasar juicio sobre la querella*. Es un defecto subsanable que puede ser corregido por la parte querellante siempre que, si se imputa delito, no haya prescrito el correspondiente delito imputado. El alto interés público implicado en este tipo de caso nos lleva a concluir que la ausencia de juramento no constituye barrera infranqueable para continuar el proceso, *cf. Meléndez Gutiérrez v. E.L.A.*, 113 D.P.R. 811, 815 (1983), una vez corregido el defecto. Si tal defecto no impide el proceso criminal ordinario, siempre que el delito no haya prescrito, no vemos por qué deba impedir la investigación y, si necesario, procesamiento de un delito imputado a una de las personas cubiertas por la Ley Núm. 2, *supra*.

▄ Ahora bien, la Ley Núm. 2, *supra*, le reconoce discreción al Secretario para darle curso a la investigación preliminar. A él es a quien corresponde determinar, *en primera instancia*, si "a su juicio [la información] constituy[e] causa suficiente para investigar si se ha cometido cualquier delito" cubierto por la ley. Art. 4 de la Ley Núm. 2, *supra*. Esa discreción, sin embargo, *no es absoluta*. En el Art. 8 de la citada ley, el legislador le impuso unas guías claras y precisas para guiar su discreción.[11] 3 L.P.R.A. sec. 99o.

Pero, además de no ser absoluta, *tampoco es exclusiva*. Aun cuando el Secretario a su juicio determine que la información no es causa suficiente para investigar, *el querellante no queda huérfano de remedios*.

▄ En el procedimiento investigativo ordinario, a los Fiscales regulares se les reconoce amplia discreción para

---

[11] La delegación de poder legislativo que concede discreción a otra de las ramas de gobierno es siempre relativa. Discreción conlleva el ejercicio razonable de una facultad. *Pueblo v. Sánchez*, 90 D.P.R. 197 (1964); *Pueblo v. Marrero Ramos, Rivera López*, 125 D.P.R. 90 (1990); *Pueblo v. Ortega Santiago*, 125 D.P.R. 203 (1990); *Pueblo v. Ortiz Delgado*, 126 D.P.R. 579 (1990).

determinar si encausan o no a un imputado. Aun luego de una determinación de causa probable para acusar en vista preliminar, nada en ley obliga al Fiscal a presentar la correspondiente acusación. *Cf.* Regla 24(b) de Procedimiento Criminal, 34 L.P.R.A. Ap. II; *Pueblo v. Tribunal Superior*, 94 D.P.R. 59 (1967). También puede solicitar el sobreseimiento del proceso con perjuicio. Regla 247 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Si el Fiscal regular decide tomar este curso de acción, el perjudicado o querellante podría tener un remedio personal contra dicho funcionario en ciertas circunstancias, *cf.* 25 L.P.R.A. sec. 973a(g),[12] *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991), pero el delito y su autor quedarían impunes. Véase, además, O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Orford, Equity Publishing Co., 1990, T. 1, págs. 91–94.

■ Sin embargo, la Ley Núm. 2, *supra, le concede al querellante un poder amplio de fiscalización de las decisiones del Secretario durante el proceso.* La Ley Núm. 2, *supra*, le impone al Secretario el deber de notificarle al querellante (y al Panel) su negativa a que se nombre un Fiscal Especial Independiente *y le reconoce a dicho querellante el derecho de recurrir al Panel para que ese Cuerpo revise tal negativa.* 3 L.P.R.A. sec. 99k(5), 99o(6) y 99r(1)(b). Tal derecho de revisión impide que la comisión de un delito quede impune si las alegaciones del querellante, a juicio del Panel, tienen méritos. Ello debe ser así, puesto que dejar en manos de la discreción del Secretario la decisión última de si procede o no en contra del querellado frustraría el propósito principal de la ley: dejar en manos de una parte imparcial la determinación final de si investiga y, si necesario, procesa a dicho querellado.

---

[12] La Carta de Derechos de las Víctimas y Testigos de Delito, Ley Núm. 22 de 22 de abril de 1988 (25 L.P.R.A. sec. 973), le requiere al Fiscal que consulte a la víctima antes de transigir una denuncia o acusación contra el autor del delito.

## V

¿Quiénes quedan cubiertos por la ley?

▮ Los Arts. 4 y 5 de la Ley Núm. 2, *supra*, 3 L.P.R.A. secs. 99k y 99*l*, cubren ese aspecto. Baste decir, para propósitos de este caso, que el Art. 4, *supra*, incluye a los legisladores, como el Honorable Rexach Benítez, dentro de los altos funcionarios de gobierno regulados por la ley. 3 L.P.R.A. sec. 99k(1)(f). Ahora bien, el Art. 5(1), 3 L.P.R.A. sec. 99*l*(1), incluye a los empleados de gobierno de menor jerarquía *no* considerados por el Art. 4, *supra*. En este tipo de casos queda a discreción del Secretario efectuar la investigación preliminar y solicitar un F.E.I. El criterio rector para ello es la determinación del Secretario de que la investigación a ser realizada por su Departamento *"podría resultar en algún conflicto de interés"*. (Énfasis suplido.) 3 L.P.R.A. sec. 99*l*(1).

▮ La determinación sobre la existencia de conflicto de intereses del Departamento de Justicia en la investigación de la conducta de personas cubiertas por el Art. 5 de la Ley Núm. 2, *supra*, puede ser expresa o tácita. Es expresa cuando el Secretario expresamente así lo determina en su remisión del caso al Panel. Es tácita cuando sus actuaciones al remitir el caso al Panel permiten concluir que al así actuar hizo una determinación de que existía un conflicto de intereses en el caso específico.

▮ Adviértase que de igual forma la ley le permite al Secretario hacer una determinación expresa o tácita de que no existe conflicto.[13] La designación de un funcionario (fiscal) del Departamento de Justicia para que asuma la

---

[13] Esta determinación también es revisable ante el Panel, quien determinará si procede el nombramiento de un *Fiscal Especial Independiente* para llevar a cabo la investigación y el procesamiento que sea necesario para disponer de la querella. 3 L.P.R.A. sec. 99o(6).

investigación de una persona cubierta por el Art. 5 de la Ley Núm. 2, *supra*, es un reconocimiento tácito de que no existe conflicto de intereses y de que el Departamento de Justicia asumirá jurisdicción. 3 L.P.R.A. sec. 99*l*(2). También puede hacerse expresamente en el informe que someta al Panel.

## VI

Finalmente llegamos al aspecto central de estos recursos. Es necesario determinar la vigencia temporal de la Ley Núm. 2, *supra*, y su aplicabilidad a los hechos de autos.

*Es postulado básico de nuestro ordenamiento penal que la ley aplicable a unos hechos delictivos es aquella vigente al tiempo de cometerse el delito.*[14] Al respecto, el Art. 4 del Código Penal, 33 L.P.R.A. sec. 3004, dispone en lo pertinente que:

> *Las leyes penales no tienen efecto retroactivo*, salvo en cuanto favorezcan a la persona imputada de delito. (Énfasis suplido.)

En esta primera oración del Art. 4 del Código Penal, *supra*, está contenida la prohibición constitucional contra las leyes *ex post facto* (Art. II, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1) así como el principio de retroactividad de la ley penal más benigna. Valga señalar que la Ley Núm. 2, *supra*, sólo incorpora un cambio de derecho procesal que no cae bajo el ámbito de la prohibición contra las leyes *ex post facto. Cf. Calder v. Bull*, 3 Dall. 385 (1798); *Thompson v. Utah*, 170 U.S. 343 (1898); D. Neváres Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. De-

---

[14] Véase D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, Sec. 4.3.1, pág. 78. Así lo acepta la representación legal de los recurridos en su escrito para mostrar causa. *Cf.* Art. 11 del Código Penal, 33 L.P.R.A. sec. 3043.

sarrollo del Derecho, 1983, Sec. 4.3.3, págs. 82–83. Según dicho estatuto, no se priva al imputado de ningún derecho constitucional ni se agrava su situación en su perjuicio. *Cf. Pueblo v. López*, 70 D.P.R. 790 (1950); *Fernández Ortega v. Rivera, Jefe del Presidio*, 70 D.P.R. 900 (1950).

La Ley Núm. 2, *supra*, contiene una cláusula de vigencia que establece:

> Esta ley comenzará a regir a los treinta (30) días siguientes a la fecha de aprobación; Disponiéndose, *que sus disposiciones aplicarán a toda información, informe o querella presentada sobre hechos ocurridos con posterioridad a la fecha de vigencia de esta ley.* (Énfasis suplido.) Art. 22 de la Ley Núm. 2 (1988 Leyes de Puerto Rico 19).

La oración que precede al "Disponiéndose" *establece claramente* la fecha de vigencia del estatuto, esto es, 30 días siguientes al 23 de febrero de 1988 (*o sea, el 25 de marzo de 1988*).

Donde surge la diversidad de interpretaciones entre los jueces del foro de instancia que han intervenido en este caso es precisamente sobre el "Disponiéndose" de este artículo.

*Resolvemos que el propósito del "Disponiéndose" del Art. 22 de la Ley Núm. 2, supra, es cualificar la aplicabilidad de la ley para enfatizar su carácter prospectivo.* Veamos.

 Antes ya reiteramos que es principio legal de derecho penal que las leyes penales tienen efecto prospectivo salvo que el legislador, expresamente, le dé efecto retroactivo y sujeto a la prohibición contra leyes *ex post facto*. De ahí que el texto claro de la ley es la expresión por excelencia de la intención legislativa, particularmente en el campo del derecho penal. El texto no debe menospreciarse o descartarse vía interpretación judicial utilizando recónditas y aisladas motivaciones legislativas.

 El texto claro del "Disponiéndose" aquí en controversia establece, *sin lugar a dudas*, que las disposiciones

de la Ley Núm. 2, *supra*, aplican a querellas presentadas que se fundamenten *en hechos ocurridos con posterioridad* a la vigencia de la ley, es decir, con posterioridad al 25 de marzo de 1988. *Por mandato expreso de la ley, su aplicación es prospectiva.* Cuando la ley es clara y libre de ambigüedad, su letra no debe menospreciarse bajo el pretexto de cumplir su espíritu. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14.

*A contrario sensu*, aquellas querellas que se fundamentan *en hechos ocurridos con anterioridad* a la vigencia de la ley, aun cuando se presenten para investigación con posterioridad a su vigencia, quedan fuera de la cobertura de la Ley Núm. 2, *supra*. *El criterio rector no es la presentación de la querella, sino la fecha en que ocurren los hechos.* Eso es lo que expresamente dispone la ley y nuestro ordenamiento jurídico penal.

█ Si bien es cierto que la Ley Núm. 2, *supra*, es un estatuto que varía procesalmente la investigación y procesamiento de las personas que incurren en los delitos en ella contenidos y que generalmente las leyes de carácter procesal tienen efecto retroactivo, *Texas Co. v. Sancho Bonet, T.S.*, 52 D.P.R. 658 (1938); *Franceschini v. Ujaque Ortiz*, 126 D.P.R. 540 (1990), tal norma es inaplicable cuando del texto claro de la ley surge su carácter prospectivo.

En resumen, toda querella contra las personas consideradas en la Ley Núm. 2, *supra*, fundamentadas *en hechos ocurridos con anterioridad a la fecha de vigencia de dicha ley, caen bajo la exclusiva jurisdicción del procedimiento criminal ordinario a cargo de los Fiscales del Departamento de Justicia.* El Panel creado por la Ley Núm. 2, *supra*, carece de jurisdicción sobre dichos casos aun cuando, como cuestión procesal, la querella se presentara con posterioridad a la vigencia de dicha ley.

*Por otro lado, toda querella contra las personas cubiertas por la Ley Núm. 2, supra, que esté fundamentada en*

*hechos ocurridos con posterioridad a la vigencia de dicha
ley, cae bajo la jurisdicción exclusiva del Panel y del F.E.I.
por mandato expreso de la ley.* Carece de jurisdicción el
Departamento de Justicia para iniciar procedimientos or-
dinarios en ese tipo de querella.

## VII

Apliquemos las normas antes enunciadas a los hechos
en autos.

En este caso se presentaron múltiples denuncias crimi-
nales a través del trámite ordinario contra el Senador Hon.
Roberto Rexach Benítez y la Srta. Ana Millán por alegada
violación a los Art. 166(a) y 272 del Código Penal, *supra,
fundamentadas en hechos anteriores y posteriores* a la vi-
gencia de la Ley Núm. 2, *supra.* Ello, luego de que el Panel
creado por dicha ley declinara pasar juicio sobre el informe
rendido por el Secretario sobre una querella que contra
aquellas personas fuera presentada por el Vicepresidente
del Senado de Puerto Rico sin haber sido ésta
juramentada.

A. *Efecto de la ausencia de juramento de las querellas
sobre la jurisdicción del Panel*

La falta de cumplimiento con el requisito de juramenta-
ción, expresamente dispuesto en ley y que aquí resolvemos
que es de cumplimiento estricto, impedía que el Panel
diera curso a la querella según remitida por el Secretario
con el correspondiente informe de la investigación prelimi-
nar y su recomendación. Claro está, ello no impide que
luego de devuelto el caso por el Panel al Secretario, el que-
rellante subsane el defecto de juramentación y el Secreta-
rio someta nuevamente el asunto para que el Panel deter-
mine en los méritos si procede o no el nombramiento de un
F.E.I. siempre y cuando que, si se imputa delito, el mismo

no haya prescrito. Si dicho defecto no es subsanado, no puede el Secretario evadir o circunvalar el procedimiento especial, revestido de un alto interés público, y presentar a su discreción denuncias, vía trámite ordinario, directamente al tribunal. La ley no le concede ni reconoce esa facultad.

Por esa razón carece de jurisdicción el tribunal de instancia para iniciar o continuar el trámite ordinario en tales circunstancias.

Claro está, esa conclusión sólo aplica a los cargos que se presentaron contra los recurridos *por hechos ocurridos con posterioridad* a la fecha de vigencia de la Ley Núm. 2, *supra.* Como veremos a continuación, a la señorita Millán también le cobija este trámite.

### B. *Situación de la señorita Millán*

No cabe duda que el Honorable Rexach Benítez, como legislador, está cubierto por las disposiciones del Art. 4(1)(f) de la Ley Núm. 2, *supra,* en cuanto a hechos alegadamente ocurridos con posterioridad a su vigencia.

Pero, además, la señorita Millán, por obra de las actuaciones del Secretario, también está cubierta por las disposiciones de dicha ley en relación con los hechos alegadamente ocurridos con posterioridad a su vigencia. 3 L.P.R.A. sec. 99*l*(1).

El Secretario remitió al Panel el caso contra el Senador Rexach Benítez y la señorita Millán *como un solo caso.* Al respecto, en su carta de 6 de julio de 1990, señalaba respectivamente:

(1) "Luego de investigar los hechos antes mencionados...se ha determinado que existe causa suficiente para creer que el Senador Rexach Benítez y su "empleada", Srta. Ana Millán, cometieron actos constitutivos de delito grave ..."
(2) "Por razón de que dichos pagos fueron hechos en concepto de trabajos para beneficio particular del Senador Rexach Benítez y que éstos no fueron recibidos por la persona a nombre de quien

se expidieron, existe causa suficiente para creer que tanto el Senador Rexach Benítez como la señorita Millán incurrieron en veinte (20) violaciones al Artículo 166 del Código Penal..."

(3) "En vista de lo anterior, atendiendo al hecho de que los mencionados delitos graves se cometieron con posterior a la vigencia de la Ley Núm. 2 de 1988, *entiendo que su investigación y encau[s]amiento es de la jurisdicción exclusiva del Fiscal Especial Independiente ...*"

(4) "En consecuencia, por este medio estoy refiriendo *dichos casos* ante la consideración del Panel, con la recomendación de que se designe un Fiscal Especial Independiente que proceda a investigar y a procesar *dichos casos*, de entender que existen los fundamentos legales para ello, en contra del Senador Roberto Rexach Benítez y *la Srta. Ana Millán.*"

El acto del Secretario de remitir el caso de la señorita Millán al Panel habla por sí solo. Estamos ante un tácito reconocimiento de conflicto de intereses del Departamento de Justicia. Avala esta conclusión el hecho de que el Secretario, en su carta de 6 de julio de 1990, expuso que el caso de *ambos* recurridos era "de la jurisdicción exclusiva del Fiscal Especial Independiente ...". Esa tácita determinación de conflicto de intereses, en el caso de esta empleada, obligaba al Departamento de Justicia. El Secretario no podía intentar revertir el caso a la jurisdicción ordinaria.

Hecha una determinación expresa o tácita de conflicto de intereses sobre un empleado cubierto por el Art. 5 de la Ley Núm. 2, *supra*, tal determinación no puede ser variada si en el trámite especial se incumple con el requisito estricto de juramentar la querella. Esa determinación oficial es sustantiva.

Adviértase que en el caso de autos la resolución del Panel, aunque sólo menciona en su epígrafe al Senador Rexach Benítez, en su contenido se refiere al caso sometido por el Secretario de Justicia *como uno solo*. Si bien fue el Senador Rexach Benítez quien levantó ante el Panel la falta de juramentación de la querella, *la señorita Millán suscribió dicho planteamiento jurisdiccional mediante carta, de 12 de julio de 1990, al Panel.*

*Concluimos que la resolución del Panel se refiere a ambos recurridos y que en ambos casos su determinación fue devolver el asunto al Departamento de Justicia.* Ello es así ya que la querella implicaba a ambos recurridos. La investigación preliminar del Secretario fue en cuanto a las actuaciones de ambos recurridos, y la remisión de dicho informe al Panel, con las recomendaciones del Secretario, fue en cuanto a ambos recurridos. Lógico resulta concluir que en cuanto a los hechos ocurridos con posterioridad a la vigencia de la Ley Núm. 2, *supra*, sobre los cuales el Panel tiene jurisdicción exclusiva, la situación de la señorita Millán es la misma que la del Senador Rexach Benítez.

Por ello, si se quiere encausar a la señorita Millán por esos hechos, el querellante debe subsanar el defecto de la falta de juramentación y el asunto debe ser sometido nuevamente al Secretario para posterior remisión al Panel, según dispone la ley. Claro está, siempre que los delitos imputados no hayan prescrito.

Del mismo modo, no tiene la persona afectada con la actuación del Secretario —de encausarla a través del trámite ordinario una vez hecha la determinación de conflicto— que acudir al Panel para cuestionar esa decisión del Secretario. Basta con levantar su argumento, como lo hizo la señorita Millán, ante el foro judicial.[15]

C. *Aplicación y vigencia temporal de la Ley Núm. 2 a los hechos en autos*

No cabe duda que con relación a los hechos ocurridos con posterioridad al 25 de marzo de 1988 le aplica la Ley Núm. 2, *supra*. Sobre tales hechos el Panel, y de ser procedente el F.E.I., tienen jurisdicción exclusiva (3 L.P.R.A.

---

[15] Tratándose de un planteamiento de falta de jurisdicción, hasta el propio foro de instancia lo puede levantar *sua sponte*. *Cf. Pueblo v. Pérez Casillas*, 117 D.P.R. 380 (1986).

secs. 99j, 99k(3), 99s(6), 99t y 99u) para la investigación y, de ser necesario, posterior encausamiento.

Por ello, procedía la desestimación de los cuarenta y dos (42) cargos sometidos contra el Senador Rexach Benítez (veintiuno (21) por alegada violación al Art. 166(a) y veintiuno (21) por alegada violación al Art. 272 ambos del Código Penal, *supra*) que se fundamentaban en hechos posteriores a la vigencia de la Ley Núm. 2, *supra*.([16]) Así también, procedía la desestimación de los cuarenta y dos (42) cargos por alegadas infracciones a dichos artículos sometidos contra la señorita Millán, ya que igualmente estaban fundamentados en hechos ocurridos con posterioridad a la vigencia de dicha ley.

Ahora bien, en cuanto a los cargos fundados en hechos ocurridos con anterioridad a la vigencia de la Ley Núm. 2, *supra*, no cabe duda que el Departamento de Justicia tenía facultad exclusiva para tramitar su encausamiento por la vía ordinaria.([17])

---

([16]) No erró el Hon. Juez Dávila al así resolverlo ni la Honorable Juez Ricard al confirmarlo en alzada.

([17]) La Resolución del Honorable Juez Batista de 15 de julio de 1991 determinó que el F.E.I. tenía jurisdicción exclusiva sobre *todos* los cargos. Recurriendo al Memorial Explicativo del Anteproyecto Núm. 309 (predecesor de la Ley Núm. 2, *supra*) el Honorable Juez Batista determinó que el texto del Art. 22 de la Ley Núm. 2 (1988 Leyes de Puerto Rico 19) era contradictorio, si se lee literalmente, y que para cumplir su intención legislativa debía interpretarse que:

"Cuando el Secretario de Justicia esté —a través del personal que dirige— realizando una investigación sobre alguna de las personas enumeradas en la Ley del Fiscal Especial Independiente, supra, en o antes del 25 de marzo de 1988, sobre hechos ocurridos antes de esa fecha, entonces, aunque el Secretario de Justicia termine su investigación con posterioridad a dicha fecha, él estará totalmente autorizado en ley, para encausar criminalmente ante los tribunales a los investigados. *Si por el contrario, lo que sucede es que el Secretario de Justicia comienza una investigación después del 25 de marzo de 1988, aunque los hechos sean anteriores o posteriores a dicha fecha, entonces esto será un caso para el exclusivo procesamiento criminal, por el Fiscal Especial Independiente.*

"*El factor determinante es si existía o no existía, una investigación en proceso, por el Departamento de Justicia en o antes del 25 de marzo de 1988.*" (Énfasis suplido.) Caso Núm. CE-91-513, Anejo I, pág. 11.

Incidió al así resolver. Primero, el texto del Art. 22 de la Ley Núm. 2, *supra*, es claro y libre de ambigüedad. Segundo, si aplicamos la interpretación del Honorable Juez Batista eliminamos del texto de dicho Art. 22 aquella frase que reza "sobre hechos ocurridos", frase que precisamente es el criterio rector al determinar la vi-

El texto claro del Art. 22 de la Ley Núm. 2, *supra*, no permite otra conclusión.

Por ello, el foro judicial tenía jurisdicción para considerar si había causa probable para arresto contra ambos recurridos en los treinta y seis (36) cargos (dieciocho (18) contra el Senador Rexach Benítez y dieciocho (18) contra la señorita Millán) fundamentados en hechos anteriores a la vigencia de la Ley Núm. 2, *supra*.

De los hechos en autos surge que el Honorable Juez Dávila determinó causa para arresto contra el Senador Rexach Benítez en seis (6) de esos dieciocho (18) cargos (todos por alegada violación al Art. 166(a) del Código Penal, *supra*). Sin embargo, asumió jurisdicción sobre *todos* los cargos (sesenta (60) cargos) contra la señorita Millán y determinó causa en veinte (20) de los treinta (30) cargos por alegada apropiación ilegal agravada. Art. 166(a) del Código Penal, *supra*. Determinó no causa en cuanto a los otros. Desconocemos cuántos de esos veinte (20) cargos en los que determinó causa para arresto están fundamentados en hechos anteriores a la vigencia de la Ley Núm. 2, *supra*.

A tenor con lo correctamente resuelto por el Honorable Juez Dávila, sobre la jurisdicción del foro judicial en los cargos fundados en hechos anteriores a la vigencia de la

---

gencia de dicha Ley Núm. 2. No podemos pensar que el legislador puso allí esa frase sin efecto alguno, porque al legislador no se le puede imputar actuaciones inútiles o sin sentido.

Tercero, el hecho de que en el Departamento de Justicia existiera una preocupación en cuanto a las investigaciones en proceso al momento de aprobarse la Ley Núm. 2, *supra*, no conlleva que toda investigación iniciada con posterioridad a la vigencia de la citada Ley Núm. 2 tuviera indefectiblemente que ser tramitada a través de las disposiciones de esa ley. El memorial explicativo aludido no tiene otro alcance que reflejar la preocupación oficial por las investigaciones en proceso. Pero ello no niega que el Departamento de Justicia pudiera asumir jurisdicción en casos donde los hechos por los cuales se somete querella ocurrieran con anterioridad a la fecha de vigencia de la Ley Núm. 2, *supra*, pero que se investiga y presenta la querella, como cuestión procesal, después de la fecha de vigencia de dicha ley.

Cuarto, resulta patentemente claro que el Art. 22 de la Ley Núm. 2, *supra*, enfatiza la aplicabilidad de dicha ley a querellas presentadas "sobre *hechos ocurridos con posterioridad*" a la fecha de su vigencia.

Ley Núm. 2, *supra*, el Tribunal de Distrito (Hon. Awilda Irizarry, Juez) tenía jurisdicción para celebrar la vista preliminar en los seis (6) cargos por alegada apropiación ilegal agravada contra el Senador Rexach Benítez y en todos aquellos cargos que estuvieran en igual situación temporal de los veinte (20) cargos por apropiación ilegal agravada sometidos contra la señorita Millán en los cuales el Honorable Juez Dávila determinó causa para arresto.

Incidió el Honorable Juez Batista al desestimar *todos* los cargos contra los recurridos sin hacer la esencial distinción temporal de los hechos, no de las incidencias procesales. Este es un caso donde cobra singular importancia la máxima que postula que son los hechos los que determinan el derecho aplicable. *Cf. Pueblo v. Ríos Colón*, 129 D.P.R. 71 (1991). Aquí la temporalidad de tales hechos es factor decisivo.

Por los fundamentos expuestos, *se expide el auto, se revoca la resolución dictada el 15 de julio de 1991 por el Hon. Juez Elpidio Batista y se devuelve el caso para que continúe la vista preliminar contra los recurridos en aquellos cargos en que se determinó causa probable para arresto*([18]) *y los cuales estén fundamentados en la ocurrencia de hechos anteriores a la vigencia de la ley Núm. 2, supra.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y de conformidad, a la cual se une la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Negrón García emitió una opinión concurrente y disidente. El Juez Asociado Señor Rebollo López emitió

---

([18]) Carece de méritos la hipótesis de los recurridos de que todos los cargos deben recibir igual trato porque formen parte de un mismo evento o transacción. Cada acto individual (cheque cobrado) configura un cargo independiente aunque se consideran parte de un esquema fraudulento. *Cf. Pueblo v. Burgos*, 75 D.P.R. 551, 568 (1953).

una opinión disidente. El Juez Asociado Señor Fuster Berlingeri no intervino.

— O —

Opinión concurrente y de conformidad emitida por el Juez Asociado Señor Hernández Denton, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Por considerar que en el caso de autos únicamente nos corresponde revisar una controversia de índole jurisdiccional que surgió en la etapa de vista para determinación de causa probable para arresto del Senador Roberto Rexach Benítez y la Srta. Ana M. Millán, suscribo la opinión mayoritaria emitida por el Tribunal. Comparto la posición de los compañeros Jueces Asociados Señor Negrón García y Señor Rebollo López de que la utilización de las leyes penales o de otra índole como instrumentos de presión y persecución política es reprobable y está prohibido por nuestra Constitución. Sin embargo, en la etapa procesal en que se encuentran los casos y aclarada la facultad investigativa y acusatoria del Secretario de Justicia, procede la devolución de éstos al foro de instancia para que, al continuar los procedimientos, el Senador Rexach Benítez y la Srta. Ana Millán, de así entenderlo procedente, levanten la defensa correspondiente y rebatan la presunción de que el Ministerio Fiscal ha obrado de buena fe.

I

Al evaluar este recurso tomamos en consideración el hecho de que ni el Senador Roberto Rexach Benítez ni la Srta. Ana Millán han formulado un señalamiento directo ante el foro de instancia o ante nos de que el Estado los ha acusado por razones políticas. De los autos se desprende

claramente, que tanto en la etapa de determinación de causa para arresto como en la vista preliminar, el Senador Rexach Benítez y la señorita Millán Álvarez únicamente adujeron que el Secretario de Justicia no tenía jurisdicción para encausarlos por todos los delitos alegadamente cometidos en fechas anteriores y posteriores a la vigencia de la ley que creó la figura del Fiscal Especial Independiente. El foro de instancia acogió estos señalamientos y ordenó la desestimación de todos los cargos contra los imputados.

De esta determinación recurrió la Procuradora General y señaló que el tribunal a quo incidió al privar de jurisdicción al Secretario de Justicia para encausar al Senador Rexach Benítez y a la señorita Millán Álvarez por alegadamente violar el Art. 166(a), 33 L.P.R.A. sec. 4272(a), y el Art. 272 del Código Penal, 33 L.P.R.A. sec. 4592. Oportunamente emitimos una orden para que el Senador Rexach Benítez y la señorita Millán Álvarez mostraran causa por la cual no debíamos revocar la resolución recurrida.

Habiendo comparecido los imputados, una mayoría de los miembros de esta Curia concluye que "en cuanto a los cargos fundados en hechos ocurridos con anterioridad a la vigencia de la Ley Núm. 2, *supra*, no cabe duda que el Departamento de Justicia tenía facultad exclusiva para tramitar su encausamiento por la vía ordinaria. El texto claro del Art. 22 de la Ley Núm. 2 [de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z)] no permite otra conclusión". (Escolio omitido.) Opinión mayoritaria, págs. 308–309.

Por ende, decidimos que el tribunal a quo tenía jurisdicción para considerar si había causa probable para arresto y acusación solamente en los cargos sometidos contra el Senador Rexach Benítez y la señorita Millán Álvarez fundamentados en hechos ocurridos anteriores a la vigencia de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z). Como resultado de esta decisión, se devuelve el caso al tribunal de instancia para que se celebre la correspondiente vista preliminar provista por nuestro ordena-

miento procesal. Esto es, simple y llanamente lo que hoy resuelve este Tribunal.

## II

Este dictamen no impide que, una vez se devuelvan los casos al foro de instancia, el Senador Rexach Benítez y la señorita Millán, oportunamente, invoquen que ha mediado discrimen por razón de ideas políticas en la investigación y encausamiento por los delitos imputados. Ciertamente, los imputados tienen derecho a invocar esta defensa y a fundamentarla con la prueba pertinente.

Uno de los principios rectores de nuestro ordenamiento constitucional es que "[t]odos los hombres son iguales ante la Ley". Art. II, Sec. 1 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 257. También, nuestra Carta de Derechos expresamente prohíbe "discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Carta de Derechos, *supra.*

Estos preceptos claramente prohíben que el Estado discrimine entre personas que están en circunstancias similares. Por ende, corresponde a los tribunales examinar cuidadosa y rigurosamente cualquier planteamiento de un acusado de que el Estado ha discriminado contra él por una de las razones proscritas por la Carta de Derechos.

Ahora bien, es responsabilidad de la parte afectada levantar oportunamente la defensa una vez se inicien los procedimientos criminales en un foro con jurisdicción. También tiene que someter la prueba pertinente para fundamentar la defensa de encausamiento criminal selectivo por parte del Ministerio Público y rebatir la presunción de buena fe que tiene la acción estadual. Por su parte, una vez se establezca un caso prima facie de discrimen, el Estado tiene derecho a refutar la evidencia presentando la prueba

necesaria para sostener que la investigación y acusación no son atribuibles a razones impermisibles.

No olvidemos que existe una presunción de que el Ministerio Fiscal ha obrado de buena fe y sin motivaciones políticas al encausar a una persona —J.F. Lawless, *Prosecutorial Misconduct*, Nueva York, Kluwer Law Book Publishers, Inc., 1985, Sec. 3.26, pág. 169— y que rebatirla, en términos evidenciarios, no es una tarea fácil:

> When considering an attack on the Government's exercise of its broad discretion in the decision whether to prosecute a particular case, we presume that choice has been made in good faith for reasons of sound governmental policy. See *United States v. Lichenstein*, 610 F.2d 1272, 1281 & n.4 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed. 2d 856 (1980) .... *To overcome this presumption, defendants bear a heavy burden.* (Énfasis suplido.) *United States v. Saade*, 652 F.2d 1126, 1135 (1er Cir. 1981).

Para poder prevalecer el acusado tiene que establecer que: (1) personas similarmente situadas no han sido acusadas, y (2) la selección discriminatoria por parte del Ministerio Público al acusar ha sido intencional y de mala fe, fundamentada en consideraciones impermisibles como lo son la raza, la religión, la afiliación política o el deseo de ejercer derechos constitucionales. *Wayte v. United States*, 470 U.S. 598 (1985);[1] *United States v. Berrios*, 501 F.2d 1207 (2do Cir. 1974); *United States v. Saade*, supra; *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 165 (1984), opinión disidente del Juez Asociado Señor Negrón

---

[1] Es procedente aclarar que este es el primer caso donde propiamente el Tribunal Supremo de Estados Unidos adopta como defensa el encausamiento selectivo.

Aunque ya desde 1886, en *Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886), el Tribunal federal usó un razonamiento de encausamiento selectivo y expresó que a pesar de que la ley podía ser "justa de su faz e imparcial en apariencia ... si era aplicada y administrada por la autoridad pública con un ojo vil y una mano inequitativa de forma tal que se lleven a cabo discrímenes injustos e ilegales entre personas en circunstancias similares" (traducción nuestra) se negaba la igual protección de las leyes bajo la décimocuarta enmienda, no se había enfrentado a la defensa directamente. Véase, además: Notas, *And Justice for All: Wayte v. United States and the Defense of Selective Prosecution,* 64 (Núm. 2) N.C. L. Rev. 385 (1986).

García. Véanse, además: Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in Federal Criminal Proceedings*, 45 A.L.R. Fed. 732; Anotación, *What Constitutes such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings*, 95 A.L.R.3d 280.

A modo de ejemplo, al evaluar una alegación de encausamiento selectivo hecha por un acusado de violar la Ley de Servicio Militar Selectivo, el Tribunal Supremo de los Estados Unidos expresó en *Wayte v. United States*, supra, pág. 610:

> Even if the passive policy had a discriminatory effect, petitioner has not shown that the Government intended such a result. The evidence he presented demonstrated only that the Government was aware that the passive enforcement policy would result in prosecution of vocal objectors and that they would probably make selective prosecution claims. As we have noted however: " 'Discriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decision-maker ... *selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable* group." ... In the present case, petitioner has not shown that the Government prosecuted him *because of* his protest activities. Absent such a showing, his claim of selective prosecution fails. (Énfasis suplido y en el original.)

Cabe señalar que el encausamiento selectivo, por no ir directamente al asunto de culpabilidad o inocencia del imputado, no es propiamente una defensa como las enumeradas taxativamente entre el Art. 18 y el Art. 25 del Código Penal (33 L.P.R.A. secs. 3091 y 3098) como causas de exclusión de responsabilidad:

> Selective or discriminatory prosecution while characterized as a "defense," does not address the guilt or innocence of the defendant, *but rather the constitutional propriety of the initiation of the prosecution.* Accordingly, the issue is resolved by the

court rather than by a jury. (Énfasis suplido y escolios omitidos.) Lawless, *op. cit.*, Sec. 3.22, págs. 158–159.

Por otro lado, a través de las jurisdicciones estatales se ha reconocido uniformemente que los tribunales no deben *sua sponte* desestimar unos cargos criminales sobre el fundamento de que ha habido encausamiento constitucionalmente discriminatorio. Tampoco procede que se resuelva a favor del acusado sin permitirle al Ministerio Público demostrar que la investigación fue de buena fe. Véanse: Anotación, *Preconviction Procedure for Raising Contention that Enforcement of Penal Statute or Law is Unconstitutionally Discriminatory*, 4 A.L.R.3d 404, 409 (1965); *People v. Winters*, 342 P.2d 538 (Cal. 1959). A modo de ejemplo, en *People v. Winters*, supra, se enfatizó que un juez de instancia no puede, sin antes escuchar la prueba del acusado y la del Ministerio Fiscal, concluir que la fiscalización desigual de la ley constituyó una violación a la igual protección de las leyes. En todos los casos se presume, hasta que haya prueba en juicio que demuestre lo contrario, que la función oficial se realizó regularmente por la autoridad pública.

La presentación de la evidencia que apoye la contención de encausamiento selectivo suele hacerse, de acuerdo con la jurisprudencia norteamericana, en una de dos (2) formas: para exonerar al acusado en un procedimiento criminal o para impedir mediante remedio interdictal la aplicación de un estatuto penal de forma discriminatoria.

Cuando lo que se intenta es la exoneración por cargos criminales, la norma general y la que se ha adoptado en los tribunales federales[2] es que la alegación se hace mediante moción antes del juicio conforme a la Regla 12(b)(2) de Procedimiento Criminal federal, 18 U.S.C. Lawless, *op. cit.*,

---

[2] El procedimiento para esbozar el argumento de encausamiento selectivo a nivel estatal no es uniforme. En algunos estados se hace mediante moción para desestimar en etapas tempranas del proceso. *People v. Utica Daw's Drug Coompany*, 225 N.Y.S.2d 128 (1962). Sin embargo, esta regla no es igual en todas las jurisdicciones.

Sec. 3.22, pág. 159. Es preciso, además, que se aleguen suficientes hechos de forma tal que la defensa de encausamiento selectivo rebase la etapa de frivolidad, para que proceda la celebración de una vista evidenciaria. *United States v. Oaks*, 508 F.2d 1403 ( 9no Cir. 1974). Se ha resuelto también que dicha vista evidenciaria se justifica cuando se desprende que existen hechos *tendentes* a demostrar encausamiento selectivo o que *levanten dudas* sobre las motivaciones del Ministerio Fiscal al acusar. *United States v. Saade*, supra. Se ha reconocido, además, que a nivel de descubrimiento de prueba es suficiente un *colorable basis* de que hay procesamiento discriminatorio para que se permita a la defensa ampliar su investigación. *United States v. Murdock*, 548 F.2d 599 (5to Cir. 1977). En el citado caso de *United States v. Oaks*, supra, el Tribunal devolvió el caso al foro de instancia con la instrucción de que se celebrara una vista sobre el alegado encausamiento selectivo. Instruyó, además, que si el tribunal inferior encontraba que en efecto hubo tal discrimen, debía absolver al convicto y que sólo debía prevalecer la convicción si no llegaba a tal determinación. *United States v. Oaks*, supra, pág. 1405.

Por último, cabe señalar que los criterios para determinar si procede la consideración de la defensa son totalmente distintos a los que se han establecido para que *progrese* la misma. El peso probatorio para establecer lo segundo es mucho más oneroso que el primero.

## III

En el caso de autos, los imputados no han hecho un señalamiento específico levantando como defensa el encausamiento selectivo ni han sometido la prueba correspondiente para fundamentarlo, por lo que desde este estrado apelativo prudencialmente debemos abstenernos de pronunciarnos sobre estos extremos. Tampoco debemos tomar

conocimiento judicial del Informe de la Comisión Especial del Senado para concluir que existe un caso prima facie de encausamiento criminal selectivo por el Departamento de Justicia. Como se trata de dos (2) ramas separadas del Gobierno, lo correcto es que se demuestre que la investigación y encausamiento criminal iniciado por el Departamento de Justicia fue por razones políticas y que otros legisladores similarmente situados no fueron acusados por los mismos delitos.

Si al devolver el caso al foro de instancia el Senador Rexach Benítez y la señorita Millán Álvarez impugnan los cargos radicados por estar fundamentados en cuestiones políticas, ellos tienen la obligación de traer toda la prueba que estimen necesaria para rebatir la presunción de que el Estado actuó de buena fe.

En los casos donde el Ministerio Público acuse a un líder prominente del partido de oposición, los tribunales deben examinar cuidadosamente cualquier alegación de encausamiento criminal selectivo por razones políticas. Como el Ministerio Público tiene amplia discreción para encausar criminalmente a los sospechosos de actividades delictivas, corresponde a los tribunales determinar si la acusación ha sido de mala fe y fundamentada en consideraciones impermisibles. Si se concluye que la acusación es por razones políticas, evidentemente, procede la desestimación de los cargos.

## IV

Por último, al adjudicar una controversia de esta índole, no olvidemos que en nuestro sistema democrático existe un gobierno de leyes y no de hombres.

Aunque nuestro ordenamiento prohíbe el encausamiento criminal selectivo por razones políticas, esto no significa que los líderes políticos ni los funcionarios públicos disfruten de una inmunidad total contra acusaciones cri-

minales por el mero hecho de que aleguen que otros similarmente situados también violan impunemente la ley ni de que pertenecen a un partido distinto al del Gobierno. Las posiciones particulares de los miembros de un cuerpo no deben ser óbice para que el Estado lleve a cabo sus funciones investigativas y ponga en vigor las leyes en igualdad de condiciones para todos los ciudadanos especialmente cuando se trata de leyes penales. Esto atentaría contra los valores más fundamentales de nuestra vida democrática y crearía una casta intocable de ciudadanos que estarían por encima de la ley. A los que ocupamos posiciones públicas nos corresponde el deber de observar una conducta ejemplar y de cumplir estrictamente con las leyes. Así garantizamos los valores fundamentales de nuestro ordenamiento constitucional y la confianza o fe del pueblo en sus dirigentes.

— O —

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

I

En estos recursos nuestra conciencia judicial se ha debatido en dos (2) posiciones extremas: una, producto del repudio casi instintivo al mal uso de fondos públicos, y la otra, producto del jurista que con igual intensidad rechaza todo discrimen político, sobre todo, si es la forma abusiva de un encausamiento criminal selectivo.[1] El de por sí complejo proceso de juzgar ha sido más angustioso, pues sus-

---

[1] La literatura y casuística acuña la frase procesamiento selectivo (*selective prosecution*). Con razón se ha señalado que es una tautología, pues "lo limitado de los recursos del Ministerio Fiscal, hacen que el procesamiento, por naturaleza, sea *selectivo*". (Énfasis suplido.) Notas, *Executive Targeting of Congressmen as a Violation of the Arrest Clause*, 94 Yale L.J. 647, 656 esc. 47 (1985).

cribir una de estas posiciones de ordinario conllevaría sacrificar inexorablemente los importantes valores comunitarios y éticos que representa la otra.

Originalmente, nuestro criterio se inclinó a restringir nuestra intervención decisoria simplemente a aclarar los aspectos relativos de la aplicación temporal de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z), creadora del cargo de Fiscal Especial Independiente (F.E.I.) y de otros extremos procesales. Sobre el particular, las comparecencias de las partes nos convencieron que la interpretación mayoritaria era correcta: el F.E.I. sólo puede entender en "hechos ocurridos con *posterioridad* a la fecha de [su] vigencia". Art. 22 de la Ley Núm. 2, *supra*, 3 L.P.R.A. sec. 99h n. La claridad del lenguaje, unido al análisis integral de las restantes disposiciones legales, no permiten otra interpretación. También en esta etapa inicial coincidimos con la postura mayoritaria de revocar y devolver el caso a instancia.

Sin embargo, hemos reevaluado y atemperado esa posición a la luz del análisis sobre encausamiento criminal selectivo de persecución política originalmente elaborado en el disenso del Juez Asociado Señor Rebollo López.

Aunque no hay un señalamiento directo al efecto, por todos es conocida la amplia facultad que poseemos de ir más allá del examen de las infracciones de ley o quebrantamientos de forma señalados por las partes, con el más alto fin de "evitar injusticias y demoras" (Sec. 1 de la Ley de 12 de marzo de 1903 (4 L.P.R.A. sec. 36)). *Pueblo v. Colón Obregón*, 102 D.P.R. 369 (1974); *Pueblo v. Serrano Nieves*, 93 D.P.R. 56 (1966). Con este propósito justiciero en mente, no vemos razón de peso que impida que exploremos ese camino conforme los documentos en autos y aquellos otros susceptibles de *conocimiento judicial*. " 'Los jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.' *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, 'nuestro papel, aunque limitado, no se desarrolla

en un *vacío*. Cuando los hechos son suficientemente *abrumadores*, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente *lo que todo el mundo sabe'*. (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943)." *Noriega v. Gobernador*, 122 D.P.R. 650, 696 (1988), opinión concurrente.

## II

El trasfondo eminentemente partidista surge del Informe de la Comisión Especial del Senado[2] creada en virtud de la Resolución del Senado Núm. 16, el posterior *voto explicativo*[3] de la Senadora Honorable Muñoz Mendoza y

---

[2] Compuesta por los Hons. Victoria Muñoz Mendoza, José G. Izquierdo Stella y Jorge Orama Monroig, Presidente (P.P.D.), Enrique Rodríguez Negrón (P.N.P.) y Fernando Martín García (P.I.P.), no adjudicó los "méritos del caso". Declinó ejercer toda su autoridad constitucional debido a la ausencia de "un ordenamiento que garantice una aplicación sistemática y justa, libre de toda sombra de partidismo o parcialidad". Informe de la Comisión Especial del Senado sobre la R. del S. 16 de 29 de diciembre de 1989, 11ma Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 3.

Específicamente, la Comisión Especial "tom[ó] plena conciencia de que en el caso del senador Rexach Benítez la decisión de crear una comisión especial para investigarlo se tomó usando como fundamento inicial unas imputaciones en su contra publicadas en la prensa. *Este no ha sido el trámite seguido consistentemente en el Senado*. Siendo el senador Rexach Benítez el portavoz del principal partido de minoría en el Senado, y estando la Comisión consciente de la necesidad imperiosa de observar la más escrupulosa protección de los derechos de las minorías evitando siquiera la apariencia de conducta parcializada, la Comisión Especial tenía ante sí dos posibles cursos de acción. *Uno era el de solicitar del Senado una ampliación de su mandato para investigar también las alegaciones que públicamente se han hecho sobre otros senadores, a quienes les asiste la más absoluta presunción de inocencia*. Otro era desistir de la investigación sobre el senador Rexach Benítez para evitar incurrir en una práctica que pudiere resultar, aunque esa no fuere la intención del Senado, *de fiscalización selectiva*". (Énfasis suplido.) Íd., págs. 4–5.

[3] En su *voto explicativo* de 8 de febrero de 1990, en la pág. 3, la Senadora Muñoz Mendoza consignó que las recomendaciones "de la Comisión Especial fueron el *no* aplicar a un senador un proceso y *unos criterios que no se habían aplicado a miembros del Senado en otros casos*, así como la ausencia de normas internas que regulen su conducta. *Ningún otro senador ha sido* investigado por este Cuerpo durante la presente Asamblea Legislativa. En ningún otro caso se ha constituido una Comisión Especial, *a pesar de otras alegaciones de irregularidades. Estas acciones*

el disenso del Honorable Martín García. Se desprende que la Comisión Especial nunca visualizó que el Senado entregara los documentos que acumuló durante su encomienda al Departamento de Justicia. Así se explica que la Comisión concluyera que dicho Departamento podría obrar como creyera propio, pero "con *total independencia* de lo que [la] Comisión haya hecho o el Senado pud[iera] hacer en este caso". (Énfasis suplido.) Informe de la Comisión Especial del Senado sabre la R. del S. 16 de 29 de diciembre de 1989, 11ma Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 7.

Estos antecedentes legislativos, la forma particular en que el asunto fue referido al Departamento de Justicia, los planteamientos del Senador Rexach Benítez a los miembros del *Panel sobre el Fiscal Independiente*, al Secretario de Justicia, a la Oficina del Contralor y al Gobernador de Puerto Rico, en lo pertinente, *denunciando* alegadas "irregularidades graves en el manejo de los recursos fiscales del Senado" (Caso Núm. CE-91-447, Apéndice 31) para sufragar gastos de campaña y candidatos, y la existencia de empleados fantasmas en la nómina (Carta a la Contralora Sra. Ileana Colón Carlo de 12 de febrero de 1990), expositivas además, de que "las circunstancias de [su] caso claramente dejan ver su trasfondo partidista" (Carta al Panel de 9 de julio de 1990, pág. 3 *in fine*) son fuertes indicadores de que existe un *fundamento aparentemente genuino* (*colorable basis*) de que estamos prima facie ante un encausamiento criminal selectivo por razones políticas, impermisible. *Wayte v. U.S.*, 430 U.S. 598 (1985); *United States v. Murdock*, 548 F.2d 599 (5to Cir. 1977).([4])

---

—*y omisiones*— *tienen la apariencia de una investigación o fiscalización selectiva, aunque no haya sido esa la intención del Senado". (Énfasis suplido y en el original.)*

([4]) Desconocemos el resultado, si alguno, de las denuncias del Senador Rexach Benítez ante la Oficina del Contralor. De igual modo no sabemos en qué quedaron sus solicitudes sobre la nómina, nombramientos extendidos y los contratos de servicios suscritos por el Senado (Peticiones al Cuerpo de 5 y 8 de febrero de 1990).

Aún bajo el prisma de no haber demostrado prima facie su caso, como imputado, el *fundamento aparentemente genuino* antes aludido lo haría acreedor a ese descu-

Ahora bien, una vez establecido ese hecho prima facie, el curso de acción de los tribunales no es, en esta etapa preliminar, ordenar el archivo de los casos. Aunque un reclamo de esta naturaleza, en última instancia, es una cuestión de derecho —*United States v. Napper*, 553 F. Supp. 231; 574 F. Supp. 1521, 1527 (Cir. D.C. 1982)— se exige prueba en vista evidenciaria, ya que ello sólo "cambia el peso hacia el Ministerio Fiscal quien tendrá ahora la carga de demostrar que el encausamiento no fue predicado en un objetivo caprichoso (*invidious objective*)". (Traducción nuestra.) *United States v. Saade*, 652 F.2d 1126, 1135 (1er Cir. 1981).

En la medida en que la opinión mayoritaria se abstiene totalmente de adjudicar la cuestión, *disentimos*. Debió reconocerse que estamos ante un caso prima facie de encausamiento criminal selectivo por razones partidistas,[5] y que correspondía al Ministerio Público y/o al F.E.I. demostrar la legitimidad y validez de su actuación.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

---

brimiento de documentos en este singular proceso. *State v. Gilbert*, 736 P.2d 857 (Idaho App. 1987). También tiene derecho a citar como testigos a aquellas personas y funcionarios que puedan prestar testimonio pertinente y arrojar luz sobre esa defensa.

"Un imputado no tiene necesidad de presentar un caso *prima facie* para justificar una vista evidenciaria. Mientras alegue algunos hechos a) que tiendan a demostrar que se le ha encauzado selectivamente, y b) levantando una duda razonable de que el propósito del Ministerio Fiscal responde a criterios proscritos, véanse: *United States v. Larson*, 612 F.2d 1301, 1304–05 (8vo Cir.,), *cert. denegado*, 446 U.S. 936, 100 S.Ct. 2154, 64 L. Ed. 2d 789 (1980); *United States v. Berrios*, 501 F. 2d 1211–1212 & n.4; *United States v. Falk*, 479 F.2d 616, 620 (7mo Cir. 1973 (in banc), una corte de distrito, en ausencia de razones válidas, debe conceder la solicitud de vista." (Traducción nuestra.) *United States v. Saade*, 652 F.2d 1126, 1135 (1er Cir. 1981).

[5] "Bajo esta fórmula lo esencial es probar que la selección individual estuvo viciada por un ejercicio discrecional indebido, motivada por criterios ajenos a una sana y establecida política pública administrativa. La ausencia de rutina o método objetivo y neutral en la actuación gubernamental tiende a apoyar que ese discernimiento respondió a consideraciones constitucionales vedadas." *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 165 (1984), opinión disidente.

Con el obvio propósito no sólo de impresionar al lector sino que el de desviar la atención de éste del *asunto fundamental* que verdaderamente plantea el recurso ante nuestra consideración, se asevera en la opinión hoy emitida por una mayoría de los integrantes del Tribunal que el

> ...análisis, razonamiento y decisión [contenidos en la misma se fundamentan] en varios *postulados medulares de la democracia, a saber: que nuestro sistema de gobierno es uno de ley y no de hombres; que la ley aplica a todos por igual; que nadie está por encima de ella* .... (Énfasis suplido.) Opinión mayoritaria, págs. 278–279.

Dicho aserto mayoritario —en vista de los hechos que la Mayoría no relata— posiblemente constituye el ejemplo más claro de *ingenuidad judicial,* del cual hemos tenido conocimiento, en toda la historia jurisprudencial de este Tribunal. Al así actuar, *la Mayoría pasa por alto unos hechos notorios de los cuales este Tribunal jurídicamente puede tomar conocimiento judicial meramente a base de una lectura de unos documentos públicos obrantes en el Senado de Puerto Rico.*

*El descargo responsable del puesto que ocupamos nos obliga a denunciar —por tercera ocasión desde que ocupamos el mismo— la cruda e inconstitucional utilización, por parte del Gobierno de turno en un momento determinado de nuestra historia, del procedimiento criminal vigente en nuestra jurisdicción con el ilegal propósito de perseguir a un adversario político.*

Desgraciadamente para nuestro ordenamiento jurídico, y por tercera ocasión, este Tribunal ignora esta repugnante realidad, *privando de esa forma a nuestra ciudadanía del establecimiento en nuestra jurisdicción de una norma, clara y firme, que impida que la persecución política subsista en nuestro País.* Este Tribunal no puede continuar patrocinando la existencia de dicha práctica meramente a base de su silencio y de ignorar la misma.

# I

*¿Es éste efectivamente un caso de persecución política?* Curiosamente, *la contestación en la afirmativa a la referida interrogante nos la brinda la propia Comisión Especial* que, mediante la R. del S. Núm. 16 de fecha 23 de enero de 1989, pág. 1, creara dicho alto Cuerpo Legislativo para "investigar posibles irregularidades alegadamente cometidas en la contratación y pago de empleados adscritos a la Oficina del Portavoz de la Minoría Novoprogresista del Senado de Puerto Rico y ordenar a dicha Comisión llevar a cabo la referida investigación"; *un "Voto Explicativo" que, con fecha de 8 de febrero de 1990, emitiera la Senadora Victoria Muñoz Mendoza* —quien fuera uno de los integrantes de dicha Comisión— al *disentir* de la acción del Senado de Puerto Rico de remitir el asunto al Secretario de Justicia de Puerto Rico; *y unas expresiones que en el hemiciclo del Senado hiciera el Senador Fernando Martín*, portavoz de la Minoría Independentista y miembro igualmente de dicha Comisión, al *disentir* de la referida acción del Senado de Puerto Rico.

# II

Conforme surge, en lo pertinente, de la "exposición de motivos" de la citada Resolución Núm. 16, págs. 1–2, el Senado de Puerto Rico —hondamente preocupado por el "serio impacto sobre el nombre y la reputación, no tan sólo de la Oficina del senador Rexach Benítez y su equipo de trabajo, *sino también sobre el buen nombre y reputación de todo el Cuerpo, sus miembros, funcionarios y empleados*" y con el propósito de "*dar cuenta* de estas alegaciones al Pueblo de Puerto Rico, *y tomar las medidas que correspondan para corregir cualquier situación irregular, si la hubiere*" (énfasis suplido)— decidió crear una Comisión Especial para investigar una *información periodística* en que se ale-

gaba la existencia de irregularidades en la nómina de la oficina del Senador Rexach Benítez.(1) Dicha Comisión Especial —la cual estaría integrada por cinco (5) Senadores, a ser designados los mismos por el Presidente del Senado, tres (3) de los cuales serían miembros de la mayoría popular senatorial, uno de la minoría novoprogresista y otro por la minoría independentista— se le encomendó la obligación, una vez terminada la correspondiente investigación, de "presentar a la brevedad posible, un informe al Senado, conteniendo sus hallazgos, conclusiones de hecho y de derecho y sus recomendaciones ...". R. del S. 16, ante, pág. 2.

Debidamente constituida, la Comisión Especial rindió el *informe* requerido el día 29 de diciembre de 1989. El mismo fue suscrito, *de manera unánime,* por sus cinco (5) miembros, esto es, los Senadores Jorge Orama Monroig, José G. Izquierdo Stella, Victoria Muñoz Mendoza, Enrique Rodríguez Negrón y Fernando Martín García.

En lo pertinente a nuestra tesis sobre persecución política, merece destacarse que la referida Comisión Especial expresó:

> ...la Comisión Especial toma plena conciencia de que en el caso del senador Rexach Benítez la decisión de crear una comisión especial para investigarlo *se tomó usando como fundamento inicial unas imputaciones en su contra publicadas en la prensa. Este no ha sido el trámite seguido consistentemente en el Senado.* Siendo el senador Rexach Benítez el portavoz del principal partido de minoría en el Senado, y estando la Comisión consciente de la necesidad imperiosa de observar *la más escrupulosa protección de los derechos de las minorías evitando siquiera la apariencia de conducta parcializada,* la Comisión Especial tenía ante sí *dos* posibles cursos de acción. *Uno era el de solicitar del Senado una ampliación de su mandato para investigar también las alegaciones que públicamente se han hecho sobre otros senadores,* a quienes les asiste la más absoluta

---

(1) Conforme se desprende de la referida exposición de motivos, la Sra. Nélida Acosta Millán aparecía como si fuera empleada del Senador Rexach Benítez cuando ello no era correcto; cobrando los cheques expedidos a nombre de ella una persona de nombre Ana Millán, quien era "prima" de la señora Acosta Millán.

presunción de inocencia. *Otro era desistir de la investigación sobre el senador Rexach Benítez para evitar incurrir en una práctica que pudiere resultar, aunque esa no fuere la intención del Senado, de fiscalización selectiva.*

El solicitar la ampliación de la jurisdicción de la Comisión Especial *tenía el atractivo de la consistencia*; la Comisión Especial *lo ha rechazado*, sin embargo, al examinar sus fundamentos *y posibles consecuencias.*

*Ampliar la investigación supondría refrendar el principio operacional de que basta que aparezca una alegación en la prensa contra un senador para que el Senado se vea compelido a iniciar un proceso de investigación de la misma envergadura que el que se inició con respecto al Senador Rexach Benítez.* Aplicar consistentemente este principio nos llevaría sin duda al absurdo de que, teóricamente, todos los senadores estarían expuestos a ser objeto de una investigación legislativa por cualquier alegación periodística y virtualmente podrían paralizarse los trabajos del Senado. Bastaría una alegación, independientemente de los méritos de la misma, para colocar a un senador en el banquillo de los acusados.

*Es evidente que debe requerirse algo más que una mera alegación para comprometer al Senado a una investigación legislativa.* Debe crearse un mecanismo procesal permanente que requiera la radicación de una querella formal, acompañada de declaraciones juradas, y luego un procedimiento preliminar que permita aquilatar la seriedad y la suficiencia de los cargos *antes de que se proceda a la plenitud de una investigación detallada y extensa, como la que se ha realizado en el caso del senador Rexach Benítez.*

Resulta inevitable *confrontar la difícil situación que tenemos ante nosotros.* Convencidos que sería un grave error el dar paso a un proceso de ampliación, que bien podría convertirse en una cacería de brujas y que tendría el efecto de trivializar la solemnidad de las facultades investigativas del Senado; *e igualmente decididos a no aplicarle a un senador un proceso y unos criterios que no podríamos responsablemente aplicarle a otros,* nos vemos compelidos a recomendarle al Senado en pleno: (1) que *no* se tome acción alguna con respecto al senador Rexach Benítez, *salvo en el aspecto que explicaremos;* (2) y que el Comité Especial dé por concluída sus labores. (Énfasis suplido.) Informe de la Comisión Especial del Senado sobre la R. del S. 16 de 29 de diciembre de 1989, 11ma Asamblea Legislativa, 3ra Sesión Ordinaria, págs. 4–6.

Resulta procedente señalar que la citada Comisión Es-

pecial, a base de lo anteriormente señalado, finalmente le hizo al Senado de Puerto Rico las siguientes cuatro (4) recomendaciones:

### III. *RECOMENDACIONES*

En mérito de todo lo cual, esta Comisión Especial formula las siguientes recomendaciones al Senado de Puerto Rico:

A. *Que censure, como impropio e ilegal el comportamiento admitido por el senador Rexach Benítez al contratar una persona a sabiendas de que ésta no iba a rendir labor alguna.*

B. *Que no se tome ninguna otra acción respecto a las alegaciones de irregularidades administrativas en la oficina del Senador Roberto Rexach Benítez que motivaron la creación de la Comisión Especial.* Esta recomendación en modo alguno supone pasar juicio sobre los méritos de las alegaciones y la prueba; por el contrario, resulta en una decisión de abstención de considerar las mismas. Por lo tanto, esta recomendación no es condenatoria ni absolutoria.

C. Que apruebe, durante la próxima sesión ordinaria, un Código de [É]tica que rija la conducta de los senadores y que reglamente los procedimientos correspondientes.

D. Que esta Comisión Especial, creada en virtud de la Resolución del Senado 16, dé por terminada su gestión. (Énfasis suplido.)([2]) Informe, ante, págs. 8–9.

No obstante la recomendación unánime de la Comisión Especial, *sobre la cual nos abstenemos de emitir juicio en este momento,* a los efectos de que el Senado de Puerto Rico no "tome ninguna otra acción respecto a las alegaciones de

---

([2]) Merece destacarse que la recomendación de la Comisión Especial sobre censura al Senador Rexach Benítez se basó, conforme expresara la propia Comisión Especial, en que los hechos fueron:

"...aceptados por el Senador en su carta al Secretario de Justicia del 23 de febrero del corriente en la que el Senador devuelve al erario las cantidades de dinero que se desembolsaron en virtud del contrato antes mencionado. Ante esta admisión pública del Senador Rexach Benítez, esta Comisión Especial recomienda al Senado que lo censure por esta práctica impropia e ilegal de contratación. Nótese que esta recomendación no la hace la Comisión en virtud de la evidencia que pueda haber recibido sobre estos hechos sino únicamente en virtud de las admisiones hechas *públicas voluntariamente por el Senador Rexach Benítez. La Comisión reitera que se* abstiene de aquilatar toda prueba que hubiere recibido como resultado del poder conferídole por la Resolución del Senado 16; o de hacer recomendaciones a base de dicha prueba." Informe de la Comisión Especial del Senado sobre la R. del S. 16 de 29 de diciembre de 1989, 11ma Asamblea Legislativa, 3ra Sesión Ordinaria, pág. 7.

irregularidades administrativas en la oficina del Senador Roberto Rexach Benítez", Informe, ante, pág. 8 —*basada dicha recomendación en la realidad incuestionable que la irregularidad por éste incurrida no era una única ni exclusiva de la oficina de este Senador en el Senado*— dicho Cuerpo Legislativo decidió, el 1ro de febrero de 1990, referir el asunto, y enviar toda la "información recopilada", al Departamento de Justicia de Puerto Rico "para su consideración conforme a derecho".

*En relación con dicha acción mayoritaria senatorial, la Senadora Victoria Muñoz Mendoza emitió un Voto Explicativo "disidente".* En lo pertinente a la tesis de persecución política, expresó la Senadora Muñoz Mendoza:

> Además, es importante señalar que algunos de los fundamentos de las recomendaciones de la Comisión Especial fueron el no aplicar a un senador un proceso y unos criterios que no se habían aplicado a miembros del Senado en otros casos, así como la ausencia de normas internas que regulen su conducta. *Ningún otro senador ha sido investigado por este Cuerpo durante la presente Asamblea Legislativa. En ningún otro caso se ha constituido una Comisión Especial, a pesar de otras alegaciones de irregularidades. Estas acciones —y omisiones— tienen la apariencia de una investigación o fiscalización selectiva*, aunque no haya sido esa la intención del Senado.
>
> . . . . . . . . .
>
> El Senado de Puerto Rico debe actuar con firmeza para hacer valer tanto los derechos de la mayoría como de las minorías parlamentarias. Esos derechos, que deben ser protegidos por todos, *pueden ser vulnerados por investigaciones selectivas y el trato desigual a las minorías en casos de acciones disciplinarias.*
>
> Me reafirmo en la recomendación contenida en el Informe de la Comisión Especial para que se establezca un ordenamiento *que garantice una aplicación sistemática y justa, libre de toda sombra de partidismo o parcialidad, de los procedimientos relacionados con la conducta de los miembros del Senado.* La adopción de un Código de Ética debe ser prioridad inmediata de este Cuerpo. (Énfasis en el original suprimido y énfasis suplido.) Voto explicativo al Senado sobre la R. del S. 16 de 8 de febrero de 1990, 11ma Asamblea Legislativa, 3ra Sesión Ordinaria, págs. 3–4.

Por otro lado, y en relación con nuestro aserto de que se trata de una persecución política, *resultan igualmente ilustrativas las expresiones que hiciera el Senador Fernando Martín*, en el hemiciclo del Senado de Puerto Rico,(³) al *igualmente disentir* de la acción del Senado de remitir el asunto al Secretario de Justicia de Puerto Rico. Expresó, en esa ocasión y en lo pertinente, el Senador Martín:

SR. MARTIN GARCIA: Señor Presidente y compañeros del Senado. Después de ver la maniobra de pretender discutir juntos estos dos asuntos, que son asuntos separados, *casi se pregunta uno si vale la pena hacer uso de la palabra y apelar a la racionalidad de los componentes de este Cuerpo.* Sin embargo, para que el récord no quede huérfano de las expresiones que voy a hacer, voy a hacer uso de la palabra.

. . . . . . . . .

Lo que si está planteado en el día de hoy son dos cosas, número uno, el informe; número dos, una moción separada, que la Mayoría ha insistido que se vea conjuntamente, que es una moción separada y distinta de que la evidencia recopilada en la investigación se le entregue al Secretario de Justicia. Yo, evidentemente soy firmante del informe y evidentemente lo sostengo. *Con lo que estoy totalmente en contra es con la moción de que esta evidencia se le haga disponible al Secretario de Justicia. Y estoy en contra por dos razones, las primeras son, a falta de mejor palabra, razones que tienen que ver con moral política. Las segundas, tiene[n] que ver con razones jurídicas.* Vamos, en primer lugar, a las razones de moral política. *Si la determinación de esa Comisión valiente y correcta*, a mi juicio, de que no estábamos dispuestos a pasar juicio sobre el senador Rexach Benítez y la evidencia que ante nos había llegado, *por razón de entender que constitu[í]a un trato diferencial diferente al que se le daba a otros Senadores que habían sido también inculpados en la prensa por acciones que pudieron o no poder cometid[o,] no viene al caso los méritos.* Si ésa fue nuestra determinación y ésa entiendo yo que fue, entonces desvirtuamos totalmente, totalmente el fundamento de nuestra decisión *a la hora de entregar por la puerta de atrás lo que no estábamos dispuestos a hacer por la puerta del frente.* Porque si bien es cierto que al no tomar decisión alguna sobre si acusar o no al

---

(³) Véase XLIV (Núm. 9) Diario de Sesiones (Procedimientos y Debates de la Asamblea Legislativa), 167–169 (1990).

senador Rexach, *evitábamos incurrir en fiscalización selectiva al entregarle la investigación a Justicia, el resultado de la investigación vamos a ver que se ha incurrido en investigación selectiva.*

Ahora resulta que cuando nos digan "*¿y la investigación, y los documentos que recopilaron sobre los otros Senadores?*" Y le tenemos que decir no los tenemos, porque no los investigamos. *Así es que si vamos a ser fieles y cónsonos al principio de que no creemos en la investigación, en la fiscalización selectiva, principio que es un principio fundamental y básico de cualquier democracia y que es el soporte básico de la integridad de una institución como [é]sta,* entonces ¿cómo vamos a trivializar y a convertir nuestra acción en una *acción mezquina* cubriéndonos con el taparrabo de que no creemos en fiscalización selectiva, pero entonces agarramos las cajas de documentos y se las entregamos al Secretario de Justicia? Es un acto que ni siquiera el de Poncio Pilato tiene comparación con esto.

Yo creo que esto constituye *un grave error,* porque afecta la integridad del funcionamiento de este Senado, *creo que es un error de moral política gravísimo, creo que desvirtúa el informe y que lo hace sal y agua.* Y que lo de virtuoso, lo de correcto, lo de valiente, que pueda haber tenido la decisión que tomamos se hace sal y agua cuando le sacamos el calzo a nuestra decisión .... (Énfasis suplido.)

En palabras de un popularísimo refrán: "al buen entendedor con pocas palabras basta."

Independientemente de la propiedad, corrección y moralidad de la acción, y decisión, de la Comisión Especial de no actuar contra ninguno de los Senadores querellados —*hecho sobre el cual, prudencialmente, nos abstenemos de pasar juicio*— parece ser obvio que la Comisión Especial tomó *el acuerdo, o compromiso,* de meramente *amonestar* al Senador Rexach Benítez, por las irregularidades ocurridas en su oficina, *a cambio* de que no se investigara a ningún otro miembro del Senado de Puerto Rico; Senadores respecto a los cuales igualmente existían imputaciones similares a la del Senador Rexach Benítez. Pecaríamos de ingenuos si no concluyéramos, adicionalmente, que ese acuerdo unánime de los integrantes de la Comisión Especial tuvo que haber contado con la *aprobación previa* del liderato del Senado de

Puerto Rico, ya que una decisión de esa envergadura, de ordinario, es consultada de antemano.

*¿Qué sucedió entonces?* Sencillo. Una vez "concluidos" los trabajos de la Comisión Especial —sin haberse investigado, y recopilado evidencia respecto, a los otros Senadores acusados de las mismas irregularidades que el Senador Rexach Benítez— se viola el compromiso por el partido político de mayoría y se acuerda enviar la evidencia recopilada, relativa al Senador Rexach Benítez, al Secretario de Justicia de Puerto Rico; *esto es, selectivamente se pone en marcha la maquinaria de la justicia contra este miembro minoritario del Senado y se "olvidan", como por arte de magia, las irregularidades alegadamente cometidas por los otros miembros del Senado.*

De hecho, el trámite seguido por la mayoría parlamentaria del Senado, y lo allí acontecido, desafortunadamente causa la impresión de que el Senador Rexach Benítez fue víctima de una variación del tristemente famoso, e infame, "juego del pescaíto".

### III

La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 257, establece que:

La dignidad del ser humano es inviolable. Todos los hombres *son iguales* ante la Ley. *No podrá establecerse discrimen alguno por motivo de* raza, color, sexo, nacimiento, origen o condición social, *ni ideas políticas o religiosas.* Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Énfasis suplido.)

Al discutirse el alcance de la cláusula constitucional citada en el seno de la Convención Constituyente se vertieron, en lo pertinente, expresiones como las siguientes:

Ideas políticas o religiosas. Se reconoce el derecho a tener

*ideas políticas* y convicciones religiosas diferentes y en conflicto entre sí *sin que esta diferencia o este conflicto milite en favor o en contra de ciudadano alguno en sus relaciones con el Estado.* La libertad de pensamiento y la libertad de conciencia quedan aquí protegidas no sólo en su expresión sino también en las consecuencias de esta expresión.

. . . . . . . . .

El más amplio reconocimiento del derecho a diferir *y ser, no obstante, tratado con igualdad y protegido en esa diferencia por el poder público, es uno de los rasgos definidores de la democracia liberal.* (Énfasis en el original suprimido y énfasis suplido.)([4])

En *Clemente v. Depto. de la Vivienda,* 114 D.P.R. 763, 767 y 768 (1983) —caso en que revocamos la sentencia, desestimatoria de la demanda, emitida por el tribunal de instancia y en que devolvimos el mismo al mencionado foro para que dilucidara la alegación, por parte del demandante, de que se le despidió de su empleo por razón de discrimen político— este Tribunal expresó que en "el pasado hemos sido *muy celosos y rigurosos en nuestra fundamental tarea de proteger la libertad ideológica contra gestiones represivas del Estado* o algunos de sus funcionarios", que el "lenguaje del citado Art. II, Sec. 1 de nuestra Constitución es expreso, claro e inequívoco; *prohíbe y protege a un ciudadano contra toda clase de discrimen*", y que dicho lenguaje sencillamente "garantiza el *disfrute de la libertad ideológica* a que tiene derecho todo individuo en una sociedad democrática como la nuestra". (Énfasis suplido.)

*Recalcamos, y enfatizamos, el hecho de que no estamos sosteniendo que* el Gobierno de Puerto Rico —a través del Departamento de Justicia o de un fiscal independiente bajo la disposiciones de la Ley Núm. 2 de 23 de febrero de 1988 (3 L.P.R.A. secs. 99h–99z)— *no* pueda encausar criminalmente a un miembro del Senado de Puerto Rico por alegadas infracciones a algunas de las disposiciones del vigente

---

([4]) 4 Diario de Sesiones de la Convención Constituyente, 2562 (1951).

Código Penal de Puerto Rico. *Lo que sostenemos es que el Gobierno no lo puede hacer en forma selectiva y discriminatoria en violación de la citada Sec. 1 del Art. II de nuestra Constitución*; esto es, *contra unos sí y contra otros no.*

Nuestra posición a esos efectos *ni* es de reciente cuño *ni* ha sido "diseñada" para el caso específico del Senador Roberto Rexach Benítez. Para que una persona pueda percatarse de ello, todo lo que necesita es realizar una breve incursión en nuestra jurisprudencia. Si así lo hace, descubrirá nuestras expresiones, a estos mismos efectos, en los casos de *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 167 (1984), y *Pueblo v. Lausell Hernández*, 121 D.P.R. 823 (1988).

Como se recordará —en relación con el caso de *Hernández Colón v. Srio. de Hacienda*, ante— en el mes de julio de 1980, el Secretario de Hacienda de Puerto Rico le notificó al Lcdo. Rafael Hernández Colón, entonces ex Gobernador y candidato a dicho cargo por el Partido Popular Democrático en las elecciones generales que se celebrarían en el mes de noviembre de ese año, unas supuestas deficiencias contributivas, resultado las mismas de una investigación realizada por dicho Departamento como consecuencia de unas informaciones periodísticas. El licenciado Hernández Colón prontamente impugnó en el foro judicial la alegada deficiencia. En la acción judicial que a esos efectos radicara *alegó* no sólo que no adeudaba contribución sobre la propiedad alguna, *sino que dicha investigación era producto de una persecución política.* El tribunal de instancia dictó *sentencia sumaria* declarando con lugar la acción radicada en cuanto a algunas de las deficiencias imputadas y sin lugar en cuanto a otras. *No emitió juicio alguno el foro de instancia sobre la alegación de persecución política planteada por el licenciado Hernández Colón.* Éste acudió en revisión ante este Tribunal.

Al disentir de la opinión mayoritaria, la cual meramente se limitó a resolver que el licenciado Hernández Co-

lón no adeudaba contribución alguna sobre la propiedad, expresamos, en lo pertinente, que:

*Si alguna importancia* de tipo jurídico tiene este caso *es el planteamiento del demandante sobre posible persecución política*; el hecho de si el contribuyente adeuda o no las alegadas deficiencias *es secundario.*

. . . . . . . .

No hay duda de que, *de ser cierto lo alegado por el contribuyente, la acción del Departamento de Hacienda de Puerto Rico merece nuestro más enérgico repudio.* Igualmente *objetable* a nuestro sistema democrático de gobierno, sin embargo, resulta ser *la acción de este Tribunal que*, al "opta[r] por adjudicar el recurso dentro de estricto Derecho contributivo" *impide que se resuelva la imputación de supuesta persecución política, dejando en el limbo la cuestión*; cometiéndose de ese modo una injusticia no sólo con el contribuyente, que tiene perfectísimo derecho a que un tribunal de justicia adjudique su alegación, sino con los funcionarios públicos contra los cuales va dirigida la imputación en controversia, cuya reputación queda "manchada" para siempre, negándosele la oportunidad a éstos de tener su "día en corte" y de demostrar que lo alegado por el contribuyente es falso. (Énfasis en el original suprimido y énfasis suplido.) *Hernández Colón v. Srio. de Hacienda,* supra, págs. 169–170.

Cuatro (4) años más tarde, al disentir de la ponencia mayoritaria que confirmó una convicción criminal decretada por el foro de instancia contra el apelante Luis Lausell Hernández por una supuesta infracción a la Sec. 145(c) de la Ley de Contribuciones sobre Ingresos de 1954,[5] expresamos en *Pueblo v. Lausell Hernández*, ante, págs. 853–854 y 850–851, *en lo pertinente*, que:

No tenemos duda de que nos encontramos ante un estatuto —la Sec. 145[(c)]— que es neutral y constitucional de su faz y que se proyecta sin hacer distinción alguna entre personas. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). Ahora bien, es de todos conocido que aun ante estatutos como el que ocupa nuestra atención, puede surgir un problema consti-

---

[5] 13 L.P.R.A. sec. 3145(c).

tucional si el mismo es aplicado *en forma arbitraria, selectiva y discriminatoria* a una persona o a un grupo de personas. *Carter v. Jury Commission*, 396 U.S. 320, 337 (1970). Ello, como es sabido, constituye una violación del derecho a la igual protección de las leyes.

La utilización de leyes fiscales *como mecanismos de presión y persecución* no tiene cabida alguna en nuestro sistema democrático de gobierno. *Dicho curso de acción debería merecer el más enérgico y unánime repudio de parte de este Tribunal, el cual se supone que sea el máximo guardián y garantizador de los derechos ciudadanos que consagra la Constitución del Estado Libre Asociado de Puerto Rico.* Hoy rechazamos y condenamos dicha acción al igual que lo hicimos en el año 1984 en *Hernández Colón v. Srio. de Hacienda*, 115 D.P.R. 145, 167 (1984).

Disentimos en el presente caso por cuanto la prueba presentada en el mismo a nivel de instancia y las inferencias lógicas y razonables que de la misma pueden hacerse nos convencen de que el Estado, al acusar y procesar al apelante Luis A. Lausell Hernández, *aplicó selectiva y discriminatoriamente* las disposiciones de la Sec. 145[(c)] de la Ley de Contribuciones sobre Ingresos de 1954 (13 L.P.R.A. sec. 3145(c)), *en violación de la Cláusula sobre la igual Protección de las Leyes de nuestra Constitución.* (Énfasis suplido.)

## IV

Como surge de la relación de hechos que hiciéramos en la Parte I de la presente ponencia —hechos que, repetimos, la Mayoría omitió mencionar— *no* hay duda alguna que en la oficina del Portavoz de la minoría novoprogresista en el Senado de Puerto Rico se cometieron unas irregularidades. Así, inclusive, lo aceptó el propio portavoz Rexach Benítez.

No debe tampoco haber duda, sin embargo, de que la Comisión Especial a la cual el Senado de Puerto Rico le encomendó la investigación de dichas irregularidades encontró, y así lo hizo constar por escrito en el informe que rindiera, *que eran varios los Senadores que aparentemente habían incurrido en irregularidades similares a las cometidas por el Senador Rexach Benítez.* Tal fue la preocupación de la referida Comisión por la *magnitud de las irregu-*

*laridades existentes en las oficinas de otros Senadores* que la Comisión, antes de solicitar que se ampliara su investigación, prefirió "recomendarle" al Senado que se desistiera de la investigación ordenada contra el Senador Rexach Benítez y que no se tomara ninguna otra acción, aparte de censurarlo, contra el referido Senador.

Por otro lado, la existencia de violaciones similares en la oficina de otros miembros del Senado de Puerto Rico, y el "señalamiento selectivo" de Rexach Benítez, constituyeron el principal fundamento en que descansó el voto explicativo que la Senadora Victoria Muñoz Mendoza emitió al oponerese, y votarle en contra, a la acción de la mayoría de los miembros de su propio partido político de referir el asunto al Secretario de Justicia de Puerto Rico. Esa impermisible acción de discrimen político fue la que, igual y enérgicamente, repudió el Senador Fernando Martín mediante las expresiones que hiciera en el hemiciclo del Senado de Puerto Rico.

Si es que, como se expresara en la "exposición de motivos" de la antes mencionada R. del S. 16, págs. 1–2, el propósito tras la investigación ordenada respecto al Senador Rexach Benítez lo era la honda preocupación del Senado referente al "serio impacto sobre el *nombre* y *reputación* ... de *todo* el Cuerpo, sus miembros, funcionarios y empleados" y "tomar las *medidas* que correspondan *para corregir cualquier situación* irregular, si la hubiere" (énfasis suplido), *¿por qué razón el Senado no amplió la investigación para cubrir las oficinas de todos los Senadores a quienes se le imputaban esas irregularidades?*

Por otro lado, procede que uno, igualmente, *se pregunte el por qué el entonces Secretario de Justicia de Puerto Rico, Lcdo. Héctor Rivera Cruz, no utilizó sus amplios recursos, al ser advertido de la posibilidad de la comisión de posible delito por parte de otros Senadores, para investigar a esos otros miembros del Senado de Puerto Rico y radicar contra éstos los cargos criminales que correspondieran.*

Las contestaciones a dichas interrogantes son obvias: sólo se interesaba procesar, *y perseguir políticamente*, al Senador Roberto Rexach Benítez.

## V

La mayoría del Tribunal, en un intento de contrarrestar nuestro señalamiento sobre "procesamiento selectivo" del Senador Rexach Benítez, expresa, en síntesis, que: (1) dicho planteamiento no ha sido levantado por el Senador Rexach Benítez, esto es, que ha sido planteado motu proprio por el Juez suscribiente a "destiempo"; (2) la posición que el Juez suscribiente hoy asume —de "resolver" el señalamiento en esta etapa de los procedimientos— resulta ser, conforme la Mayoría, contradictoria con la posición que asumimos en el pasado en el caso *Hernández Colón v. Srio. de Hacienda*, ante; (3) "la *prominencia pública* del acusado y el hecho de que sea *miembro de una minoría*, o la *supuesta ausencia de acusación a otros supuestos violadores, de por sí*, tampoco [le] permite [al Tribunal] pasar juicio sobre la alegación de discrimen traída por la opinión disidente", (énfasis suplido y en el original) opinión mayoritaria, pág. 281, y (4) lo "ocurrido en el Senado de Puerto Rico no impedía que el Departamento de Justicia investigara y formulara los cargos que procedieran en derecho". Opinión mayoritaria, pág. 282.

Verdaderamente resulta ser innecesario extenderse mucho en la "refutación" de dichos señalamientos. Los mismos realmente constituyen un lastimoso esfuerzo de la mayoría por justificar su incomprensible actitud de inaccción —por segunda ocasión en el corto término de cinco (5) años— ante la cruda, y jurídicamente indeseable, utilización por parte del Estado del proceso criminal como mecanismo de persecución política en este País. Ello no obstante, y por aquello de que lector alguno pueda abrigar dudas al res-

pecto, procedemos a discutir, aun cuando brevemente, dichos señalamientos:

Los *documentos* de los cuales surge, con palmaria claridad, *la evidencia sobre procesamiento selectivo del Senador Rexach Benítez* —esto es, el *informe* que rindieron la antes mencionada *Comisión Especial* del Senado de Puerto Rico; el *voto disidente explicativo* emitido por la *Senadora Muñoz Mendoza*, y las *expresiones* del *Senador Martín*, plasmadas las mismas en el Diario de Sesiones de dicho cuerpo legislativo— *son documentos públicos de los cuales este Tribunal puede tomar conocimiento judicial.* A esos efectos, véase: *Regla 11 de las Reglas de Evidencia de 1979* (32 L.P.R.A. Ap. IV); *Asoc. de Periodistas v. González,* 127 D.P.R. 704 (1991).

Establece la sec. 36 del Título 4 de las Leyes de Puerto Rico Anotadas que:

> *Sec. 36. Facultades como tribunal de apelación*
> El Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un tribunal de apelación y no un tribunal de casación. *En sus deliberaciones y fallos en todos los asuntos,* tanto en lo civil como en lo criminal, *dicho Tribunal no se limitará solamente a infracciones de ley o quebrantamientos de forma, según fueren señalados, alegados o salvados por los litigantes,* o según se hiciera constar en sus exposiciones y excepciones *sino que con el más alto fin de justicia, el Tribunal puede también entender en todos los hechos y tramitaciones en la causa tal como aparecieren en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras.* (Énfasis suplido.)

A esos efectos, y desde bien temprano en su historia, este Tribunal ha expresado con justificado orgullo, en innumerables y reiteradas ocasiones, que en su función revisora *no* se limitará a la consideración de los errores señalados sino que, *siendo su obligación velar por que se haga justicia a todo aquel que de acuerdo con su más sano criterio como juzgador tiene derecho a ello,* entenderá en *todos los hechos y trámites* que dieron lugar al recurso ante su

consideración con el propósito de evitar la comisión de injusticias. Cientos de decisiones, emitidas en el pasado por este Tribunal, constituyen prueba innegable de ese alto sentido del deber que, desafortunadamente, se ha ido desvaneciendo en los últimos años. Véase, entre otros: *Ab Intestato Marini Pabón*, 107 D.P.R. 433 (1978); *Pueblo v. Santiago*, 106 D.P.R. 1 (1977); *Dávila v. Valdejully*, 84 D.P.R. 101 (1961); *Pérez v. Acevedo Quiñones*, 100 D.P.R. 894 (1972); *Pueblo v. Colón Obregón*, 102 D.P.R. 369 (1974); y otros.

De manera, pues, que el señalamiento de la mayoría de los integrantes del Tribunal a los efectos de que no consideran el planteamiento nuestro sobre procesamiento selectivo debido a que el Senador Rexach Benítez no lo ha levantado y que, en consecuencia, el mismo es uno hecho a "destiempo", *no pasa de ser una mera simpleza y una penosa excusa para no cumplir con su irrenunciable función de hacer justicia.*

Por otro lado, causa sorpresa el señalamiento de la mayoría a los efectos de que la posición que hoy asumimos en el presente caso es, alegadamente, contradictoria con la posición que asumiéramos en el caso *Hernández Colón v. Srio. de Hacienda*, ante. Dicho señalamiento denota, cuando menos, una *lamentable insuficiencia* en la capacidad de análisis e interpretación jurídica de parte de esa mayoría. En el citado caso de *Hernández Colón v. Srio. de Hacienda* se trataba de una *alegación* de persecución política, formulada la misma dentro de una *solicitud de sentencia sumaria; alegación* que estaba basada en declaraciones juradas y unas actuaciones oficiales administrativas de las cuales el recurrente Hernández Colón hacía unas inferencias. Dichas *alegaciones* habían sido objeto de refutación a nivel de instancia, en cumplimiento de las disposiciones de la Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, por el Departamento de Hacienda. Siendo esa la situación, lo jurídicamente procedente era lo que propusi-

mos en aquel entonces: devolver el caso al foro de instancia para que éste dilucidara la referida controversia de hechos. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

En el caso hoy ante nuestra consideración, *ese trámite no es necesario.* Contrario al citado caso *Hernández Colón v. Srio. de Hacienda*, ante, en que el tribunal de instancia para poder adjudicar la *alegación* de persecución política tenía que, inclusive,.*dirimir la credibilidad* de los testigos que sobre dicho asunto entendieran procedente presentar las partes, *en el presente caso el hecho del procesamiento selectivo surge, con transparente claridad, de prueba documental de la cual podemos tomar conocimiento judicial.* Este Tribunal, en innumerables y reiteradas ocasiones, *ha resuelto que, en lo que respecta a la evaluación de prueba documental, se encuentra en idéntica posición que la de los tribunales de instancia; esto es, podemos llegar a nuestras propias conclusiones.* Véanse, entre otros: *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708 (1981); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Central Igualdad v. Srio. Hacienda*, 83 D.P.R. 45 (1961). Dicha evidencia de discrimen político, unida precisamente a los hechos que menciona la Mayoría, esto es, "la prominencia pública del acusado y el hecho de que [éste] sea miembro de una minoría" (opinión mayoritaria, pág. 281) *hacen que la determinación sobre procesamiento selectivo "resalte a la vista y hiera la retina".* Véase *In re Roldán González*, 113 D.P.R. 238, 242 (1982).

En relación con este último señalamiento, la Mayoría, adicionalmente, expresa que "la supuesta ausencia de acusación a otros supuestos violadores, de por sí, tampoco nos permite pasar juicio sobre la alegación de discrimen ...". (Énfasis suprimido.) Opinión mayoritaria, pág. 281. Debe quedar meridianamente claro que *no* estamos sosteniendo que *el mero hecho* de que no se hayan acusado a otras per-

sonas por idénticas irregularidades a las cometidas por Rexach Benítez es, de por sí, índice de discrimen impermisible. Esto es, *y a manera de ejemplo*, ciertamente *no* constituye defensa para un conductor de vehículos de motor que haya sido denunciado por la policía por no detenerse ante un semáforo el simple hecho de que el policía no hubiera denunciado a otros conductores que hubieran cometido la misma infracción. Lo que sí es impermisible, desde un punto de vista constitucional, es que ese conductor haya sido denunciado porque su tez, a diferencia de los otros, es de tal o cual color o porque él, distinto a los otros, es de tal o cual partido político.

En el caso específico ante nuestra consideración, se investigó y se ha procesado *únicamente* al Senador Rexach Benítez y *no* se ha investigado, *ni* procesado, a ningún otro de los integrantes del Senado sobre los cuales también hubo querellas. Del propio *informe rendido por la Comisión Especial del Senado*; del *voto disidente explicativo emitido por la Senadora Muñoz Mendoza*, y de las *expresiones del Senador Martín* claramente se desprende *que la razón fue una política*; esto es, por el hecho de que el Senador Rexach era miembro de la minoría novoprogresista y los otros Senadores no. Debe mantenerse presente que: *"ante la admisión de parte, relevo de prueba."*

Por último, y en relación con el señalamiento relativo a que lo "ocurrido en el Senado de Puerto Rico no impedía que el Departamento de Justicia investigara y formulara los cargos que procedieran en derecho" (opinión mayoritaria, pág. 282), sólo podemos decir que "no hay peor ciego que el que no quiere ver". No hay duda de que, independientemente de lo que el Senado de Puerto Rico hiciera, el Secretario del Departamento de Justicia tenía la facultad para acusar al Senador Rexach Benítez y/o a cualquiera otro de los Senadores a quienes se les había imputado idénticas violaciones a las del Senador Rexach Benítez. *Dicho, débil y desesperado, señalamiento se contesta con dos*

*sencillas preguntas, a saber*: (1) ¿quién era el Secretario de Justicia de Puerto Rico para el 1ro de febrero de 1990?,([6]) y (2) ¿a qué otro miembro del Senado de Puerto Rico, si alguno, el Departamento de Justicia investigó y procesó en adición al Senador Rexach Benítez? El entonces Secretario Rivera Cruz procedió, única y selectivamente, contra el Senador Rexach Benítez; *ratificando de esta manera, e incurriendo en, la práctica de discrimen político en que había originalmente incurrido el Senado de Puerto Rico.*

## VI

Que una situación, como la que sirve de origen al recurso ante nuestra consideración, suceda en la "Casa de las Leyes", *es, cuando menos, algo ciertamente desafortunado y poco ejemplarizante para Puerto Rico.*

Que *únicamente se investigue a*, y se *radiquen cargos criminales* contra, *uno sólo* de los responsables de esa situación, *resulta ser una situación intolerable e inconstitucional que este Tribunal, independientemente de toda otra consideración, no debe permitir que suceda.*

Algunos pensarán que es preferible que se acuse a uno que a ninguno. *Esa posición, sin embargo, no es constitucionalmente permisible.* Si este Tribunal, ante una clara situación de procesamiento criminal selectivo y discriminatorio —violatoria de la Sec. 1 del Art. II de nuestra Constitución, ante— se hace de la "vista larga", *no sólo permite que impunemente se viole la Constitución, sino que se convierte en cómplice de ello.*

Ante una violación constitucional de esta magnitud, *este Tribunal tiene el deber ineludible de buscar una vía deciso-*

---

([6]) Todavía están latentes en nuestra memoria —esto es, ni tan siquiera resulta ser necesario tomar conocimiento judicial de documentos o informaciones periodísticas para refrescar la misma— las continuas y agrias disputas públicas que, desde el comienzo de su gestión como Secretario de Justicia, sostuvo el Lic. Héctor Rivera Cruz con el Senador Roberto Rexach Benítez.

*ria procesal que reivindique adecuadamente los derechos violados.* Véase *Noriega v. Gobernador,* 122 D.P.R. 650 (1988). Dicho remedio, en nuestra opinión, debe de ser *el archivo de los cargos criminales* radicados en el presente caso. *Ese curso decisorio es la única forma de ponerle fin, de una vez y por todas, a esta inconstitucional práctica de persecución política.* Hoy se persigue al Senador Rexach Benítez; *mañana, puede ser a cualquier otro de los ciudadanos de este País.*

El foro judicial *ni* es colonia de las Ramas Ejecutiva y Legislativa *ni* puede convertirse en cómplice de las actuaciones inconstitucionales de éstas.